MINNESOTA MINING & MANUFAC-
TURING CO., Inc., Plaintiff,

v.

KENT INDUSTRIES, INC., et al.,
Defendants.

Civ. No. 24499.

United States District Court
E. D. Michigan, S. D.

Sept. 15, 1967.

Leslie W. Fleming, Butzel, Eaman, Long, Gust & Kennedy, Detroit, Mich., for plaintiff, Harold J. Kinney, S. G. DeLaHunt, Carpenter, Kinney & Coulter, St. Paul, Minn., of counsel.

Daniel G. Cullen, Cullen, Sloman & Cantor, Detroit, Mich., for defendants.

OPINION

KAESS, District Judge.

Plaintiff, MINNESOTA MINING & MANUFACTURING COMPANY (referred to as 3M), a corporation of Delaware, seeks an injunction and damages against KENT INDUSTRIES, INC., et al, a corporation of Michigan, for alleged infringement of its Thomson Patent No. 2,610,910 relating to a "Neoprene-Phenolic Adhesive Cement". Jurisdiction and venue have been admitted.

In addition to the usual defenses of non-infringement and invalidity due to "obviousness", defendants contend that the Thomson patent is invalid because the patented cement was publicly used and offered for sale by plaintiff more than one year before the filing date, contrary to 35 U.S.C. § 102(b); and also because the patentee Thomson was not the actual inventor of the patented cement.

Since a holding for defendants on either of the latter two affirmative defenses would be dispositive of the com-

plaint, the Court ordered a separate trial on these relatively simple issues under Rule 42(b) of the F.R.Civ.P., the remaining issues being reserved for a later trial, if necessary.

The Thomson patent, granted on September 16, 1952, was filed on January 13, 1949 as a continuation-in-part of an earlier application filed September 7, 1943. Since the original Thomson patent application was filed on September 7, 1943, the critical date for the purpose of the defense of prior public use and on sale becomes September 7, 1942.

Defendants contend that plaintiff repeatedly and continuously publicly used and offered for sale the patented cement beginning as early as May 5, 1942, four months prior to the September 7 critical date, as part of plaintiff's efforts to commercialize a non-skid floor covering called "Trimite." Plaintiff, while admitting the fact of these activities, contends that such use was "experimental" and therefore not fatal to the validity of the patent.

The invention claimed by the patent is a brushable adhesive cement comprising just three ingredients:

(1) Polychloroprene (commonly known as Neoprene)

(2) Phenol Aldehyde Resin (PAR), and

(3) A Volatile Organic Solvent.

While the claims specify a range of proportions for these three ingredients, the proportions are not here in dispute. This mixture of Neoprene plus PAR plus solvent is described in the patent specification and claims as highly resistant to gelation in the container during storage, and capable of forming a strong bond on smooth metal surfaces at ordinary room temperatures, without the application of additional heat.

Based upon numerous contemporaneous documents offered in evidence and considerable oral testimony, the Court finds the pre-filing date history of the patented cement to be as follows:

With the advent of World War II, 3M like other companies needed new markets for its products. The history here starts with 3M's efforts to develop a new market for its abrasive-coated cloth known as "Trimite." This sandpaper-like cloth, previously manufactured and sold by 3M for many years for use in abrasive application, was, in 1942, promoted by 3M for a new use as a non-skid floor or deck covering. For this new use, an adhesive cement was required to secure it to the floor or deck.

The earliest commercial use of the patented cement arose out of 3M's wartime promotion of Trimite as a non-skid deck covering material for use on walkways and around gun mounts aboard Navy ships. In early 1942, the Boston Navy Yard had been testing 3M's Trimite cloth bonded to decks with a "hot setting" cement, i.e., one which required application of external heat to form the bond.

Although this non-skid surface comprising Trimite cloth and heat-activated cement was satisfactory as far as it went, the Navy and 3M both recognized the desirability of using a "cold" or self-activating cement which did not require the use of heating equipment for its activation, so as to facilitate wartime "at sea" repairs.

In response to this need of the Navy for a cold setting cement for securing Trimite, plaintiff's sales manager in charge of the Adhesives and Coatings Division, L. F. Weyand, asked the Chief Chemist of that division, F. J. Wehmer, to recommend a cold cement for this application. Wehmer in turn asked Andrew Farley Thomson, a chemist on his staff, for such a recommendation in April of 1942.

Thomson's testimony and laboratory notebook entries describe numerous tests and experiments which he conducted during April in response to this request. He mixed numerous batches of each of a variety of Neoprene-PAR adhesives, as well as other formulations. From these batches, Thomson prepared test specimens by bonding together various materials, including at least nine panels of Trimite bonded to steel. He testified that he conducted destructive and peel tests

on these specimens to determine the strength of the adhesive bond. Thereafter, he prepared additional specimens using the remainder of previously prepared cement batches and similarly tested these.

Based upon his successful April testing and experimentation with the cold-setting Neoprene-PAR formulations, Thomson rejected the other formulations and selected as best the formulation identified as 54586-1, recorded on page 54586 of his laboratory notebook. This Neoprene-PAR formulation was the ultimately patented cement.

█ The testimony of Wehmer and Thomson amply establishes to the Court's satisfaction that the patented cement was fully conceived, reduced to practice and successfully tested when Chief Chemist Wehmer approached Thomson in early May for a sample Trimite panel made with a cold adhesive to submit to the Navy Bureau of Ships. Based upon his earlier experience and successful testing, Thomson selected one of the Trimite-steel panels which he had previously bonded with 54586-1 (the patented cement) as having the best bond properties and gave it to Wehmer.

On May 5, 1942, Sales Manager Weyand, accompanied by Wehmer, took the sample Trimite panel which Thomson had bonded with the patented cement, and which Thomson and Wehmer had selected as best, to the Bureau of Ships in Washington, where it was shown to Mr. T. A. Werkenthin, a Material Engineer with the Bureau of Ships. This visit was a follow-up of earlier Trimite sales promotional efforts of plaintiff. Werkenthin was favorably impressed with this sample panel, particularly with the cold cement feature. Werkenthin, in accordance with routine Navy procurement procedure, requested that Minnesota Mining submit a formal letter requesting that the Navy conduct a procurement approval test on the Trimite-cold cement system.

The details and purpose of the Navy procurement approval procedure were fully explained in the deposition testimony of Joseph Chilcote, a former Materials Engineer with the Bureau of Ships. During 1942, Chilcote worked under the supervision of Werkenthin, and was responsible for deck covering materials and adhesives. He was familiar with the Navy approval procedures and was personally involved with the Navy approval of the 3M Trimite non-skid deck covering.

Chilcote testified that the Navy maintained a Qualified Products List, a compilation of specific products, and their manufacturers, which had been approved as meeting applicable Navy specifications. The Navy required that products be so listed prior to quantity procurement. The listing procedure required the submission of a sample by the manufacturer for Navy procurement approval tests, along with a certification that the manufacturer was capable of filling Navy purchase orders. Chilcote further testified that the Material Laboratory at the New York Navy Yard, where the Trimite system was tested, was not authorized to conduct any experimental work, but functioned strictly as a part of Navy procurement to assure the Navy that it was getting material suitable for its own use.

Thus, following the visit of Sales Manager Weyand and Wehmer to the Bureau of Ships on May 5, 1942, and in compliance with the Navy procurement approval procedure, a letter was sent to the Navy by 3M's New York Sales Manager on May 11, 1942 requesting that the Navy conduct its approval tests upon the 3M Trimite-cold set cement system. The request was immediately approved by the Navy. Thomson prepared a one gallon sample of his Neoprene-PAR cement, recorded his work on page 54590 of his notebook, and personally delivered this cement sample to the New York Navy Yard on June 1, 1942. This sample essentially duplicated his earlier 54586–1 formulation, and like that earlier formulation, was admittedly the ultimately patented cement.

Prior to submitting the one gallon sample to the Navy, Chief Chemist

Wehmer and Sales Manager Weyand changed the identification of the cement from its experimental code number 54590 to a commercial code number "EC 613." Wehmer testified that the conversion from the experimental code number to the commercial code number was because 3M knew that the Navy would be purchasing Trimite along with the patented cement if it passed the approval test, and that it was therefore desirable to submit the cement to the Navy under the commercial code EC 613, which code number has been retained to this very day.

The Navy started its laboratory procurement approval tests on Trimite secured with the EC 613 cement on June 11, 1942, and completed them on July 20, 1942. The New York Navy Materials Laboratory issued a report recommending approval of this system on August 6, 1942, and the Bureau of Ships ultimately issued its formal Certificate of Approval on September 25, 1942.

Following the August 6, 1942 Navy Laboratory approval recommendation and prior to the formal Navy Certificate of Approval, plaintiff's sales manager on August 24 reported the Navy's approval to plaintiff's sales force and urged them to advise their accounts of this approval. This was followed on September 5 by a further sales letter accompanied by instructions for installing Trimite with the EC 613 patented cement.

This entire sequence of events relating to the Navy approval of Trimite and EC 613 cement, starting with the May 5 visit to the Bureau of Ships and through the September 25 formal Certificate of Approval, is fully supported by the testimony of defendants' witness Chilcote, and plaintiff's witnesses Thomson and Wehmer, and is described in copious correspondence and internal documents of both Minnesota Mining and the Navy.

Meanwhile, plaintiff had been conducting a similar effort to secure approval of the use of Trimite and EC 613 patented cement, non-skid floor covering by the United States Maritime Commission. Documentary exhibits indicate that the Maritime Commission was aware of the August 6 New York Navy Yard test report, and issued its formal approval on September 8, 1942, just one day after the September 7, critical date.

Concurrently, during the summer of 1942, Minnesota Mining's sales organization was actively attempting to sell Trimite non-skid floor coverings, to be fastened in place by the EC 613 patented cement to numerous other governmental and industrial customers across the United States. Thomson personally prepared many Trimite display panels formed of Trimite cloth bonded to steel backing plates by the patented EC 613 cement, as well as sample cans of liquid or wet EC 613. These samples were sent to potential customers, or displayed to or left with them by 3M salesmen. Numerous reports by salesmen from both 3M's Adhesives Division and 3M's Abrasives Division, beginning as early as June 10, 1942, recorded their customer calls and efforts to promote sales of Trimite, accompanied by the patented EC 613 cement, to shipbuilding companies and aircraft builders, among others. These reports typically reported contacts between 3M salesmen and customer's purchasing agents, engineers, technicians, etc., relating to attempts to sell many different products of the 3M line, including Trimite and the patented cement. These reports further recorded the display of sample Trimite panels and requests by customers for samples of Trimite cloth and cans of the patented cement.

This resulted in sales by 3M in 1942 of $140,000 of Trimite Cloth and $7,000 of the patented cement. Although no documentation was found to indicate the specific dates of the individual sales summarized in a 1942 Sales Summary exhibit, it is significant that two of the pre-September 7, 1942 critical date reports of customer calls by salesmen were followed by actual sales to those customers some time during 1942.

Based upon the ample testimony and contemporaneous documentation, the Court finds that beginning in May, 1942,

more than one year before the filing date of the patent-in-suit, and continuing through and beyond the critical date of September 7, 1942, plaintiff conducted a substantial and energetic sales program to promote and sell Trimite cloth in conjunction with the patented cement.

Hence, the Court finds and concludes that the patent-in-suit is invalid under 35 U.S.C. § 102(b) because it was applied for more than one year after (1) the patented cement was used to make up sample Trimite display panels which were publicly used and displayed by 3M salesmen to promote sales of Trimite cloth, and (2) was offered for sale by 3M's salesmen in connection with their efforts to sell Trimite for use as a non-skid floor covering.

■ Untimely filing of a patent application after a patentee's prior "public use or on sale" has long been held a bar to patent validity. The policy behind such a rule is to prevent an inventor from holding back the secrets of his invention, while at the same time exploiting them, and thereafter applying for a limited monopoly when faced with competition, thus delaying the time when the invention becomes freely available to the public. Pennock v. Dialogue, 27 U.S. 1, 2 Pet. 1, 7 L.Ed. 327; Huszar v. Cincinnati Chemical Works, 172 F.2d 6 (C.A. 6, 1949). Whether delayed filing resulted from inadvertence, negligence or wilful holding back, the delay becomes fatal to the patent.

The burden was on defendants to establish the "public use or on sale" activities prior to the critical date. The Court finds that defendants successfully maintained this burden.

■■ Plaintiff contends that its precritical date activities were excusable as "experimental" and thus, not fatal. Consequently, the burden shifts to plaintiff to establish by full, convincing and unequivocal proof that this activity was part of a bona fide program of experimentation, rather than commercial activities. Smith & Griggs Mfg. v. Sprague, 123 U.S. 249, 264, 8 S.Ct. 122, 31 L.Ed. 141 (1887). An "on sale" effort or a use involving public disclosure, if not *solely* for the purpose of experimentation, does not avoid the statutory bar. Egbert v. Lippmann, 104 U.S. 333, 336, 26 L.Ed. 755 (1881); Smith & Griggs, supra, 123 U.S. at 256, 8 S.Ct. 122, 31 L.Ed. 141.

It is plaintiff's contention that the patented cement was neither in public use nor on sale prior to September 7, 1942 critical date because:

(1) Thomson was unable to produce large size factory production batches of the patented cement having adequate shelf life (resistance against aging or gelation in the can) until he added an additional chemical ingredient called Cumar on September 22, two weeks after the critical date; and

(2) The nationwide activities of 3M's salesmen were necessary and legitimate experimentation to provide field evaluations, as opposed to laboratory tests, of the Trimite and patented cement floor covering.

Plaintiff places great emphasis on the importance of the ingredient Cumar and its contribution to enhanced shelf life of the cement. Assuming Cumar to be highly desirable as an additive to the cement, this contention is nevertheless unpersuasive and irrelevant to the issue before the Court. This issue concerns only whether the *patented* cement was in public use or on sale prior to September 7, 1942. As discussed above, the patented cement, as defined by the claims of the patent, include only three ingredients: Neopreme plus PAR plus a volatile organic solvent. Cumar, or its equivalent, is not claimed as part of the invention. Thomson and plaintiff's counsel admitted at trial that no claim of the patent includes Cumar. Although the patent specification does discuss Cumar, it specifically states that its inclusion in the cement is not essential (Col. 6, lines 42–44, and line 73 through line 4 of Col. 7), and that a cement without Cumar "is still adequate for many uses" (Col. 7, lines 28 and 29).

That Cumar is optional and not essential to the operability of the patented cement is further supported by contem-

poraneous documents, namely, the original written disclosure of Thomson to his patent attorney and also by the covering letter by Chief Chemist Wehmer.*

That Cumar is irrelevant to the issue of whether the *patented* non-Cumar cement was in public use or on sale is further shown by the fact that the cement submitted to the Navy and approved by it and the Maritime Commission did not include Cumar. Manifestly, plaintiff at that time regarded the patented cement as satisfactory and effective, despite the absence of Cumar.

Plaintiff's contention that the period of experimentation did not end until Cumar was added to the basic three ingredients in late September of 1942, is not only inconsistent with its patent, which does not claim Cumar, but is also inconsistent with contemporaneous documents which expressed the then (August, 1943) concern of its patent attorney just prior to the filing of the patent application that it be filed prior to what he at that time regarded as a public use critical date of September 8, 1942. The admitted critical date of September 8, 1942, relates to the patented, non-Cumar, cement, since the evidence establishes that it was not until two weeks later, on September 22, 1942, that Thomson decided to add Cumar.

Perhaps plaintiff's choice of September 8, 1943 as the critical public use date was explained at trial as being based upon the Maritime Commission's formal approval given on September 8, 1942. However, that date fails to take into account the four previous months of efforts by plaintiff to secure such procurement approval from the Maritime Commission and the Navy, and the four previous months of efforts to promote sales of the Trimite non-skid floor covering, with the patented cement, to other government agencies and private industrial customers. Such earlier efforts were a significant part of the program of commercial exploitation of the patented cement and were all prior to the critical date of September 7, 1942.

The Court finds that the evidence, including both documentary and oral testimony, amply establishes that experimentation on the *patented* cement had ended by May 5, 1942. By that time, Thomson had sufficiently experimented with and successfully tested the patented formulation to enable him and Chief Chemist Wehmer to conclude that the patented formulation was the best one available for securing Trimite cloth to the Navy's steel decks. Since 3M's Trimite cloth would probably have been rejected for Navy non-skid deck use if the EC 613 patented cement used with it proved unsatisfactory in the Navy procurement approval test, it is inconceivable that Minnesota Mining and Manufacturing, which had been in the adhesive cement business for many years, would have risked loss of Trimite cloth sales 20 times as large as the sales of cement used to secure it by submitting to the Navy an experimental cement, or a cement which it was not reasonably sure was adequate for the purpose. Hence, the Court finds that 3M's own prior tests were successful, that the patented cement was no longer "experimental" when it was first shown to the Navy and others, and that plaintiff's objective was to sell Trimite cloth for non-skid floor covering, with the patented cement being an essential but smaller dollar volume part of the sales program.

The Court concludes that plaintiff has failed to maintain its burden of proof that its commercial activities of May through September 7, 1942, involving the patented cement were merely "experimental." Oral testimony, particularly given twenty-five years after the event, is insufficient. Smith & Griggs, supra, 123 U.S. at 264, 8 S.Ct. 122. Moreover, the Court finds that the uncorroborated oral testimony asserting plaintiff's activities to have been merely ex-

---

* If Cumar is an essential ingredient of the cement, rather than merely an optional and unclaimed ingredient, then the Thomson patent would be void for failure to claim a necessary part of the invention. 35 U.S.C. § 112; Permutit v. Graver, 284 U.S. 52, 57, 60, 52 S.Ct. 53, 76 L.Ed. 163 (1931).

perimental is contrary to contemporaneous documentary evidence, and is unacceptable to sustain plaintiff's burden.

It is clear that the approval tests conducted by the Navy were not experimentation for Minnesota Mining or for the Navy, but were strictly *customer approval tests* to satisfy the Navy that the material offered for sale would be suitable. It is clear that plaintiff's purpose in submitting samples of the previously successfully tested patented cement to the Navy in May and June of 1942 was to comply with the Navy procurement procedure, the first step in selling Trimite and the EC 613 patented cement to the Navy, and an integral part of a sales effort. The four months of pre-critical date promotional activities to secure such Navy approval were highly successful, as affirmed by the large sales to Navy contractors and others immediately following the approval.

Plaintiff's contention that its salesmen's demonstrations to customers were merely experimental field tests, rather than sales efforts, is unpersuasive. Thomson and Wehmer were willing to, and did in fact, submit the patented cement to the Navy without field tests, and the Navy and the Maritime Commission were willing to, and did in fact, base their approval and subsequent substantial purchases upon purely laboratory testing. There is no convincing evidence to show that the inventor Thomson was involved with, or was even following the results of, any field tests conducted by potential customers prior to the critical date. The nationwide activities in question were conducted by salesmen, not test engineers. A legitimate program of experimentation and research would hardly have been conducted by plaintiff's sales organization. Nor is there any evidence of field testing. An experienced adhesive manufacturer like plaintiff scarcely needed field tests and conducted none here. Sales started after customer approval testing. Such customer testing is no different than the potential purchaser's "test drive" of an automobile or his trying on of a suit in a clothing store to see if it is satisfactory. Customer try-outs or tests are a common and integral part of many selling programs.

There is no evidence, nor any contention made by plaintiff, that Thomson or plaintiff's salesmen imposed any restrictive limitations or injunctions of secrecy upon the numerous governmental and industrial customers and their purchasing agents to whom the patented cement was displayed and offered prior to the critical date. Nor is there any evidence that any customer was advised or believed that the Trimite non-skid floor covering and patented cement were experimental, rather than commercially available products. The evidence is strongly to the contrary.

■ That actual sales of the patented cement may not have occurred prior to the critical date does not preclude the finding of invalidity. A free sample or offer for sale is also within the "on sale" provision of the statute. Smith & Griggs, supra, 123 U.S. at 258, 8 S.Ct. 122; George R. Churchill v. American Buff, 365 F.2d 129, 134 (C.A. 7, 1966).

Nor is such a finding precluded by the fact that plaintiff was not yet ready to deliver large batches to customers, because of factory production problems. The finding of invalidity is based upon the public use of the cement to sell Trimite, and the effort to obtain customer approval and purchases of the patented cement, all prior to the critical date.

■ The Court is satisfied that the program of extensive commercial activities conducted by plaintiff during the four months prior to the critical date clearly establishes a "public use" and "on sale" of the patented cement under the patent statute and that all the claims of the patent-in-suit are thereby invalid. Cataphote Corp. v. DeSoto Chemical Coatings, 356 F.2d 24 (C.A. 9, 1966), cert. den. 385 U.S. 832, 87 S.Ct. 71, 17 L.Ed.2d 67; George R. Churchill v. American Buff, supra; Tool Research & Engineering v. Honcor Corp., 367 F.2d 449 (C.A. 9, 1966), cert. den. 387 U.S.

919, 87 S.Ct. 2032, 18 L.Ed.2d 972; Koehring Company v. National Automatic Tool, 362 F.2d 100 (C.A. 7, 1966).

## CONCLUSION

Since the Court's decision that the patent-in-suit is invalid because of prior "public use" and "on sale" is dispositive of the case, there is no need to treat the issue of inventorship by Thomson. This and the remaining defenses of defendants become moot.

There being no just reason for delay, the Court enters its judgment for defendants under Rule 54(b).

Therefore, it is ordered that the complaint is dismissed, with costs to defendant.

This Opinion shall also serve as the Court's Findings under Rule 52.