**In re YARN PROCESSING PATENT VALIDITY LITIGATION.**

**SAUQUOIT FIBERS CO.**

v.

**LEESONA CORP. et al.**

**KAYSER–ROTH CORP. et al.**

v.

**LEESONA CORP. et al.**

**LEESONA CORP.**

v.

**DUPLAN CORP. et al.**

**M.D.L. Docket No. 82.**

**Civ. Nos. 72–563, 72–641 * and 72–691.**

United States District Court,
S. D. Florida.

April 25, 1973.

---

* Master Case For Twenty-Four Consolidated Actions.

See also D.C. 56 F.R.D. 648.

Henry Burnett, Fowler, White, Humkey, Burnett, Hurley & Banick, Miami, Fla., local counsel for Kayser-Roth. William K. West, Jr., and John W. Malley, Cushman, Darby & Cushman, Washington, D. C., counsel for Kayser-Roth.

William W. Beckett and Gene W. Stockman, Schuyler, Birch, Swindler, McKie & Beckett, Washington, D. C., and George W. F. Simmons, Rohm & Haas, Philadelphia, Pa., for Sauquoit Fibers Co.

Willis Flick, Blackwell, Walker, Gray & Powers, Miami, Fla., local counsel and Nolan E. Clark, James H. Wallace, Jr., Kirkland, Ellis & Rowe, Washington, D. C., general counsel for Leesona Corp.

## ORDER GRANTING MOTIONS FOR PARTIAL SUMMARY JUDGMENT

ATKINS, District Judge.

Two motions for partial summary judgment of patent invalidity have been filed in this consolidated proceeding by the parties opposing United States Letters Patent 2,803,105, 2,803,108, and 2,803,109, and they have been the subject of thorough discovery and briefing almost from the time these cases were consolidated.[1] The grounds upon which the motion is based are derived entirely from Section 102(b) of Title 35, United States Code, wherein it is provided:

A person shall be entitled to a patent unless—

\* \* \* \* \* \*

(b) the invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, . . . .

While this section reads simply enough, there is much case law both construing and applying these two standards that must be discussed before the Court can intelligently decide the question at hand. Fortunately in this instance the question presented is a relatively narrow one with most of the essential facts being ei-

1. The motion by Sauquoit was filed in the Eastern District of Pennsylvania in Sauquoit Fibers Co. v. Leesona Corp., et al., Civil No. 70–1728 on April 29, 1971. When that action was transferred here for discovery, the motion was pending although a final response had not been filed. Following the completion of the expedited discovery on the § 102(b) issues, the law was exhaustively briefed by all parties; the issue is now properly before the Court for decision.

ther stipulated to or admitted. The real contest lies in the application of the patent validity and summary judgment standards to those essentially non-disputed facts. Based on the reasons more fully set out below, the Court is of the opinion that summary judgment must be granted in favor of Sauquoit and the New York "plaintiffs" [2] declaring these "single heater" patents invalid.

I

It is appropriate at this point to detail the facts surrounding this critical period in the history of yarn processing, not so much for the purpose of showing that they are not in dispute, but rather to put the material facts in perspective.

Although Leesona now owns these patents, the applications for the three patents listed above [hereinafter referred to as '105, '108, and '109 patents] were filed by Warren A. Seem and Nicholas J. Stoddard on January 4, 1954, with the patents themselves issuing on August 20, 1957. Jointly characterized in many instances as the "single heater" patents, they disclose both an apparatus and various methods for processing thermoplastic yarns (i. e., polyamide substances such as nylon, orlon and dacron) to impart of the fluffiness, crimp, and elasticity characteristic of "false twist" yarns in a single, continuous, rapid fashion.[3] A detailed discussion of the precise language of the various claims in each patent, and how that language would withstand the other tests of patent

validity, is unnecessary at this juncture. When the charge of invalidity centers on the "public use" or "on sale" provision of § 102(b), as this summary judgment motion does, most of the technical ramifications of patent law are pretermitted, making this grossly simplistic explanation of false twisting sufficient for the Court's purposes.

The applications for these patents were the result of many years of work, both part and full-time, by Mr. Seem and Mr. Stoddard. The two men had extensive experience in the throwing industry [4] prior to their work together on what finally culminated in the patents in suit. At one time in the middle 1930's Stoddard worked under Seem at the Georgetown Silk Company, and it was during this period that their experiments in this area were first conducted jointly. In 1938 they became separated because of Stoddard's promotion and transfer to another plant, although Seem has testified that communication between the two continued. They were reunited in Philadelphia six years later, at which time the experiments resumed and a loose partnership was formed between Seem and Stoddard, the inventors, and Fred Tecce and Harold Berger, the financiers. With this partnership arrangement set up, the two inventors were able to construct and operate two successive bench models between 1944 and 1947, the latter of which incorporated "the entire apparatus as a first step toward construction of a full-scale commercial

2. For the purposes of this opinion, the term New York plaintiffs will be used to designate those members of the throwing industry who originally challenged the validity of these patents in the Eastern District of New York. *See* note 4 *infra.*

3. It is necessary for thermoplastic yarns to be given a so-called "false twist" property in order for them to be satisfactory for textile manufacturing purposes because of the lack of any natural crimp or fluffiness in the synthetic yarns. The false twist mechanically imparted to the thermoplastic yarns, whether achieved via the continuous single heater process or the

more costly and inefficient batch process familiar in the industry prior to the extremely wide acceptance of these patents, enables the knitted finished product to display the bulk and elasticity so characteristic of the fabrics manufactured from natural fibers.

4. "Throwing is the business of processing yarns consisting of continuous filament fibres and those who are engaged in it are known as throwsters." Ernest Scragg & Sons Limited v. Leesona Corp., in the Exchequer Court of Canada, No. 143,891, at 9.

size machine."[5] Experimentation on the scale model continued for the next several years, during which time Berger and Tecce sold their hosiery mills and started a throwing operation called Marionette Mills.

After moving their equipment to a protected area at the Marionette location in 1950[6], Seem and Stoddard borrowed a demonstration up-twister for conversion into a full-scale production model and moved it into the plant. Ten of the forty spindle[7] positions were converted to "single heater" false twisters with the conversion being completed in July of 1950. This machine was operated on an experimental basis for several months, but was dismantled and returned to its owner when the Permatwist partners decided to build eight full-size machines and operate them in the yet-to-be-constructed basement of Marionette. In fact only one machine was actually built—an Atwood 220 spindle up-twister—and moved to the basement. The machine was not completed until early 1952. About this same time Mr. Seem mentioned to a representative of Synthetic Yarns that he had developed this particular machine and the methods to operate it to produce stretch yarn from thermoplastic yarn in a continuous fashion,[8] and a visit from four Synthetic Yarn representatives was arranged for May 20, 1952 at which time Permatwist "made it a point to have [the machine] covered and running and in real good shape with yarn so that the demonstration would be impressive." Following some further negotiations with Synthetic's owners over the next few months, Permatwist entered into an agreement on December 15, 1952 with Synthetic Yarn that provided Synfoam, Inc. with a license to use this false twist process.[9]

## II

■ Before the facts, as summarized briefly above, can be interpreted under the § 102(b) tests, it is necessary to conclude that this early disposition is both possible and proper. Rule 56 of the F.R.Civ.P. provides that after a time period not herein relevant

. . . The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any *material fact* and that the moving party is entitled to a judgment as a matter of law. (emphasis supplied)

The Courts must be wary of granting motions for summary judgment unless both of these requirements are met because it naturally deprives the resisting party of the right to a full "trial" on the merits. However if the requirements are met, the motion should be decided. *See* Insurance Company of North America v. Bosworth Construction Co., 469 F.2d 1266 (5th Cir. 1972); Burleson v. Mead Johnson & Co., 463 F.2d 180

5. Memorandum of Leesona In Opposition to Motions by Sauquoit Fibers Company. and the New York Throwsters for Partial Summary Judgment at 16.

6. Seem, prior to this move, had sold his interests in Synthetic Yarns, Inc., a throwing company located in Massachusetts, to the company's attorney, Archibald Graustein. The significance of this sale will be apparent following the discussion on the next page.

7. The spindle is a portion of the false twist machinery, designated as capital P in figure 1 of the diagram of the '108 patent apparatus attached as Appendix A. When used in connection with a particular model, it indicates the total number of

separate means for processing the yarn, each spindle increasing arithmetically the amount of yarn that may be processed at the same time on the same machine.

8. Mr. Seem testified in the Canadian litigation that the announcement was made to Mr. Steedman of Synthetic Yarns after Mr. Steedman told him "that Synthetic Yarns had been offered a license under certain French patents owned by French people, patents that originated in France."

9. The agreement entered into by Permatwist and Synfoam is a 30 page document, the first six paragraphs of which are reproduced as Appendix B. The entire document is Exhibit 14 to the Sauquoit motion for partial summary judgment.

(5th Cir. 1972). It is admitted that neither of these cases involved the validity of patents, but the application of the rule would not, and should not, vary. Leesona cites Ag Pro, Inc. v. Sakraida, 437 F.2d 99, 101 (5th Cir. 1971), finding on remand rev'd, 474 F.2d 167 (5th Cir. 1973), for the proposition that "[s]ummary judgment is the rare exception, see Ronel Corporation v. Anchor Lock of Florida, Inc., 5 Cir. 1963, 325 F.2d 889, and not the rule in patent infringement cases." Of course that decision reversed a summary judgment determination of invalidity based on the test of "obviousness", a much more factually oriented inquiry than the § 102(b) tests. "Thus obviousness is a question of law *determined against the factual background of the state of the prior art and the claimed improvement on it.*" Stamicarbon N.V. v. Escambia Chemical Corp., 430 F.2d 920, 924 (5th Cir. 1970), quoted with approval in *Ag Pro, supra.* (emphasis added). In the appropriate circumstances even the "obviousness" test may be applied in a summary judgment decision. *See* Inject-O-Meter Mfg. Co. v. North Plains Fertilizer & Chemical, Inc., 439 F.2d 1138, 1139 (5th Cir. 1971).

With these precautions in mind then, the Court is of the opinion that if summary judgment can ever be justifiable in patent litigation, it is justifiable here where the determination is not made against an uncertain factual background.[10] *See* Strong v. General Electric Co., 434 F.2d 1042 (5th Cir. 1970), aff'g mem. 305 F.Supp. 1089 (N. D.Ga.1969), cert. denied, 403 U.S. 906, 91 S.Ct. 2207, 29 L.Ed.2d 681 (1971).

III

While the test set forth in § 102(b) is easy to comprehend, a short summary of its parameters is essential before applying it to the particular facts involved in this instance. The date that this decision revolves around is January 4, 1953—the "critical date". The statute allows an inventor one year's leeway following the completion of this invention to file the application for a patent, and in this instance the application was made on January 4, 1954. Prohibited under subsection b are both "sales" and "public uses", and a single instance of either before the critical date may result in an invalid patent. Consolidated Fruit Jar Company v. Wright, 94 U.S. 92, 24 L.Ed. 68 (1877); Hobbs v. United States Atomic Energy Commission, 451 F.2d 849, 857 (5th Cir. 1971); Strong v. General Electric Co., *supra,* 434 F.2d at 1046–1047. Although the two separate statutory bars derive from a common purpose, Woodbridge v. United States, 263 U.S. 50, 55–56, 44 S.Ct. 45, 68 L.Ed. 159 (1923); Cali v. Eastern Airlines, Inc., 442 F.2d 65 (2d Cir. 1971); Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co., 153 F.2d 516, 520 (2d Cir. 1946), cert. denied 328 U.S. 840, 66 S.Ct. 1016, 90 L.Ed. 1615, the standards employed in each are not identical. In this Circuit "[t]he mere existence of a sales contract is insufficient to establish a placing 'on sale'. The invention that is the subject of the sale must be a reality in the sense that it must be beyond the stage of experimentation." *Hobbs, supra* 451 F.2d at 859. Some courts have indicated that they will not, in applying the "on sale" test, be bound by the "overly-refined distinctions" of commercial law, Philco Corp. v. Admiral Corp., 199 F.Supp. 797, 817 (D.Del.1961), but the *Hobbs* case leads this Court to believe that reference to a type of "general contract law" in order to determine what amounts to a sale is the better part of discretion, especially when the decision is made in the granting of a summary judgment motion. *Hobbs, supra* 451 F.2d at 857, n. 4.[11]

10. "The district court incorrectly treated the question of *novelty* solely as one of law without proper consideration of pertinent factual background." Van Gorp Mfg., Inc. v. Townley Industrial Plastics, 464 F.2d 16, 18 (5th Cir. 1972).

11. The reliance in this opinion on Hobbs v. United States Atomic Energy Commission supra is not meant to indicate an unawareness of the case law relating to § 102(b) so ably developed by the United States Courts of Appeals for the Second

■ To establish the "public use" defense, the potential infringer may proceed in either of two ways: (1) demonstrate to the Court that some person (not necessarily the inventor) has made a nonsecret, nonexperimental use of the invention prior to the critical date; or (2) establish the fact that the inventor has used the patent for trade and profit, whether the use has been secret or not.[12] The former derives from Pennock v. Dialogue, 27 U.S. (2 Pet.) 1, 7 L.Ed. 327 (1829) and followed by Bates v. Coe, 98 U.S. 31, 25 L.Ed. 68 (1878); Smith & Griggs Mfg. Co. v. Sprague, 123 U.S. 249, 8 S.Ct. 122, 31 L.Ed. 141 (1887); General Talking Pictures Corp. v. Western Electric Co., 304 U.S. 175, 58 S.Ct. 849, 82 L.Ed. 1273 (1938); Electric Storage Battery Co. v. Shimadzu, 307 U.S. 5, 59 S.Ct. 675, 83 L.Ed. 1071 (1939), and the latter from Macbeth-Evans Glass Co. v. General Electric Co., 246 F. 695 (6th Cir. 1917). That decision has been followed by the Second Circuit in *Metallizing Engineering, supra,* along with several other circuits in later cases, although the Fifth Circuit does not appear to have expressly adopted the holding.

■ Implicitly accepted in the discussion of the "on sale" and "public use" defenses is the qualification that neither of the two may be shown to exist while the invention is still in the experimental stage. City of Elizabeth v. American Nicholson Pavement Co., 97 U.S. 126, 24 L.Ed. 1000 (1878).

A use which is primarily experimental and no more than incidentally for trade or profit is not a public use. *E. g.* Smith & Griggs Mfg. Co. v. Sprague, 123 U.S. 249, 8 S.Ct. 122, 31 L.Ed. 141 (1887). This is the so-called "experimental use exception". Viewed in light of the policy underlying the public use provision, however, it is no exception at all. A bona fide experimental use involves no commercial exploitation. . . .
Pickering v. Holman, 459 F.2d 403, 406 (9th Cir. 1972). *See Hobbs, supra* 451 F.2d at 859.

Summarized as it is above, the task the Court has been called on to perform in applying the law to the facts as developed in the pleadings, affidavits, depositions and interrogatories should be fairly clear-cut. There are, however, two areas of disagreement that need to be resolved before any decision can be made.

a). The first disagreement relates to the question of who has the "burden of proof" to establish the disputation of a material fact.[13] The moving parties argue that they have shown a *prima facie* case of invalidity, making it incumbent on Leesona, the patent owner party, to come forward and show to the Court that there exists a material question of fact concerning the experimental condition of the invention during 1952. This of course would make a summary judgment decision premature. Leesona counters this argument by reminding the Court of the burden—and a heavy one it is, Eagle Iron Works v. McLanahan Corp., 429 F.2d 1375 (3rd Cir. 1970)— that one must bear in requesting a dec-

---

and Third Circuits, from whose jurisdiction these cases originally came. Rather it only serves as a manifestation of this Court's understanding that the test of invalidity as set forth in Hobbs, and the Fifth Circuit in general, is somewhat more rigorous than the test that would have been applied by the original transferor district. The briefs of the moving parties in the cases cited therein demonstrate the slightly increased burden placed on the moving parties by Hobbs.

12. In this regard see the discussion of the inventor-third party dichotomy by the panel in *Hobbs*, 451 F.2d at 859–860.

13. The usage of the term "burden of proof" in this argument is somewhat confusing since it can have two different applications, and each party is using it in a different way. The New York plaintiffs mention it in discussing the motion for summary judgment and the opponent's burden, while Leesona dwells on the burden of proof that § 282 places on one challenging the validity of a patent. The discussion following has attempted to analyze each in its appropriate sphere.

laration of patent invalidity, with the extrapolation of this argument being the assertion that the burden cannot shift to Leesona. This argument is a *non sequitur*.

■ The Court is not concerned specifically with the presumption of validity that is mandated by Section 282 of Title 35, United States Code, or with the burden of proof arising thereunder. The Fifth Circuit case law makes it clear that the burden that must be borne by one who would seek to invalidate a patent will bring to their knees all but the most indomitable opponents,[14] but that is not the issue here. The request for a summary judgment puts the movant to an even more severe test—he must show not only that § 102(b) has been violated by "clear and convincing evidence" or "beyond a reasonable doubt", but as a matter of law. If the Court, after reviewing the evidence gathered and the pleadings submitted so far, is convinced that there are no material facts in dispute and that there has been the requisite showing of a sale or public use, the opponent of the motion has clearly failed to meet his "burden" set forth in Local Rule 10(J)(2) which requires that:

. . . The papers opposing a motion for summary judgment shall include a memorandum of law, necessary affidavits, and a concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried. All material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the opposing party's statement.

*See, e. g.*, Atlas v. Eastern Air Lines, Inc., 311 F.2d 156, 160 (1st Cir. 1962);

National Biscuit Co. v. Crown Baking Co., 105 F.2d 422, 425 (1st Cir. 1939); and Minnesota Mining & Manufacturing Co. v. Kent Industries, Inc., 274 F.Supp. 993, 997 (E.D.Mich.1967), aff'd, 409 F.2d 99 (6th Cir. 1969). Whether the parties have met their respective "burdens" will be discussed below.

■ b). A decision was rendered on February 28, 1964 by President Thorson in Ernest Scragg & Sons Limited v. Leesona Corporation, *formerly known as Universal Winding Co.*, in the Exchequer Court of Canada, No. 143,891 [hereinafter referred to as Exchequer Opinion], holding the Canadian counterparts of the '105, '108, and '109 [respectively 552,105, 552,103, and 552,104] valid and infringed. The main dispute in that litigation centered around the date of the inventions defined by the claims in issue. The applications for the Canadian patents were filed on September 27, 1954, although to prevail Leesona had to prove a date some years prior to that filing date. In the opening discussion of the opinion, the judge noted that "it is asserted on behalf of the defendant [Leesona] that the inventions in issue were in fact made in July, 1947." *Exchequer Opinion* at 8.

To some extent the Court has relied on various findings made by that Court relating to the actual completion date of the inventions. In that case it was to Leesona's advantage, as the assignee of the patents awarded to Mr. Seem and Mr. Stoddard, to urge the earliest invention date possible in order to qualify Seem and Stoddard as the original inventors. Leesona prevailed and evidently convinced that court as follows:

. . . In my opinion, the 10-spindle false twist conversion that was

14. That, however, is about all that they make clear. To borrow from Judge Wisdom's comments in *Hobbs*:

. . . The presumption of patent validity is rebuttable. 35 U.S.C. § 282; Radio Corp. of America v. Radio Engineering Laboratories, 1934, 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163. The courts, however, have not distinguished themselves for consistency in their de-

termination of the quantum of proof necessary to rebut the presumption.

. . .

Hobbs v. United States Atomic Energy Commission, 451 F.2d 849, 856 (5th Cir. 1971). See Harrington Mfg. Co., Inc. v. White, 475 F.2d 788, 793 (5th Cir. 1973) and Railex Corp. v. Speed Check Co., 457 F.2d 1040 (5th Cir. 1972).

completed in July, 1950, was simply a full scale commercial exemplification of the invention that Mr. Seem and Mr. Stoddard had made in July, 1947 or shortly thereafter.

*Exchequer Opinion* at 29. In order to assure the success of this finding Leesona constantly attempted to minimize the effect of the various minor changes and substitutions that were sometimes carried out during the time that the different models were being run. As the court found,

> . . . There were some differences between [the machines built for Synfoam] and the single 220-spindle machine, as I have already set out, but there were no differences in the essentials and no difference in their functioning.

*Exchequer Opinion* at 31–32.

With the motions before this Court now alleging the invalidity of the patents based on the § 102(b) tests, Leesona retreats from its previous position and now urges that the inventions were still in their experimental stages during this six year period prior to the critical date. The opposition to the summary judgment motions goes to great lengths to pick out those portions of previously taken depositions in order to prove that the inventions were not considered perfected until sometime in 1953. The Court, however, finds Leesona collaterally estopped to deny the findings of the Exchequer Court and for that reason cannot give Leesona's argument of experimental use any credence.

██ One definition of the doctrine relied on here has been provided by Professor Moore:

> . . . The essence of collateral estoppel by judgment is that some question or fact in dispute has been judicially and finally determined by a court of competent jurisdiction between the same parties or their privies. Thus the principle of such an estoppel may be stated as follows: Where there is a second action between parties, or their privies, who

are bound by a judgment rendered in a prior suit, but the second action involves a different claim, cause, or demand, the judgment in the first suit operates as a collateral estoppel as to, but only as to, those matters or points which were in issue or controverted and upon the determination of which the initial judgment necessarily depended.

1B Moore's Federal Practice ¶ 0.441[2] (2d ed.), p. 3777 (footnotes omitted). Leesona, of course, is the same party that was involved as a defendant in the case in Canada. As to the opposing parties in this proceeding, the Court is convinced that if privity is still necessary, it can be found here in the substantial identity of the patents in suit both in Canada and the United States. A finding of privity is superfluous, however, since collateral estoppel no longer appears to hinge, especially in federal question cases such as this, on the old doctrine of mutuality. *See, e. g.*, Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 324–326, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); James Talcott, Inc. v. Allahabad Bank, Ltd., 444 F.2d 451, 461–463 (5th Cir. 1971); Rachal v. Hill, 435 F. 2d 59, 61–63 (5th Cir. 1970), cert. denied, 403 U.S. 904, 91 S.Ct. 2203, 29 L. Ed.2d 680 (1971); Seguros Tepeyac, S. A. Compania Mexicana v. Jernigan, 410 F.2d 718, 727 (5th Cir. 1969), cert. denied, 396 U.S. 905, 90 S.Ct. 219, 24 L. Ed.2d 181 (1969); Herbert Rosenthal Jewelry Corp. v. Zale Corporation, 323 F.Supp. 1234, 1237 (S.D.N.Y.1971).

The determination made by the Canadian Court concerning the date of invention and the date of reduction to practice was necessary for that judgment—the dates were both in issue and controverted. The application of the collateral estoppel bar is appropriate, Poster Exchange, Inc. v. National Screen Service Corp., 456 F.2d 662, 666 (5th Cir. 1972), but only if Canada meets the test of comity set down by the Supreme Court in Hilton v. Guyot, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895). Canada does

meet that test. The result will be somewhat unusual in this instance in that the fact findings made by President Thorson that allowed Leesona to prevail against Scragg contribute to Leesona's failure here, but the collateral estoppel theory serves the same salutory objectives without regard to the final outcome. *See generally* Wilson v. Retail Credit Co., 474 F.2d 1260 (5th Cir. 1973).

## IV

Based on all of this preliminary discussion, then, the Court is called upon to review all of the facts presented in order to determine whether a material fact still remains in dispute, and if not, whether the patents are invalid as a matter of law. In accordance with the local rules of this Court, the movants have submitted proposed findings of material fact as to which they assert there is no genuine issue. These facts are summarized in paragraphs 1–14 of Appendix A of the motion by the New York plaintiffs. As was required by those same rules, Leesona, in its opposition to the motion, listed those material issues of fact as to which there does exist a genuine issue of fact to be tried, with that listing comprising paragraphs 1–11. None of those paragraphs directly controverts the facts submitted by the moving parties. Following the procedures outlined in Local Rule 10(J)(2), the Court must consider paragraphs 1 through 14 admitted by Leesona.

a). The material issues of fact listed by Leesona will be dealt with one by one, since they purport to demonstrate to the Court that summary judgment is not proper now. The first issue is "[w]hether or not the partnership of Warren A. Seem, Nicholas J. Stoddard, Harold P. Berger, and Fred D. Tecce, the Permatwist Company, was formed for the purpose of bringing to completion the development of Stoddard's and Seem's false twist process." According to Mr. Berger's testimony and Leesona's own memorandum, a "loose partnership" was formed in 1944. Even assuming

that the issue as phrased was decided in Leesona's favor it would have no effect on the outcome of this motion. Having already admitted sufficient facts to justify a conclusion that the invention embodied in the '105, '108 and '109 patents was "on sale" prior to the critical date, the only material fact is whether the invention was still in the experimental state in order to negate the otherwise invalidating effect of the sale.

b). As to the issue of whether the 1947 bench model was experimental in character, the moving parties are willing to concede, for the purpose of this decision, that the model was experimental. That has no relevancy, however, since we are concerned with an admitted sale in 1952.

c). Leesona next poses the same question in relation to the Fletcher uptwister used in 1950. For the same reason that was stated above the issue is irrelevant. Even if that issue was decided in Leesona's favor it would not affect the resolution of this motion.

d). The fourth question posed must be quoted to appreciate the full scope of it:

Whether various actions and statements by the Permatwist partners (a) show intent to sell or market the inventions immediately or (b) indicate confidence that the process would eventually be developed for commercial production and use.

The question as framed is much too expansive—the Court is concerned with the narrow time frame around the sale of the invention. Statements made by the inventors or their partners prior to 1952, if they indicated the latter, would not be relevant to the intent of the partners during 1952 because the invention could obviously have lost its experimental qualities in the intervening period prior to May 20, 1952. Rephrasing the question in light of this the question should contain the words "during 1952" after "partners" in the second line.

After this bit of semantic gymnastics is Leesona in any better position to resist the granting of this motion? I

think not. The test as set forth in *Hobbs* requires only (1) a sale of an invention that (2) is no longer at the experimental stage. *Hobbs, supra* 451 F. 2d at 859. Already satisfied is the first requirement; the whole thrust of this motion is directed toward a determination of the second. It could be persuasively argued that a determination of "[w]hether various actions and statements by the [inventors] . . . indicate confidence that the process would eventually be developed for commercial production and use" would contribute not one whit towards answering the primary question. However, even assuming that the "actions and statements" of the inventors could assist the Court in finding an invention "experimental", no such assistance is found here. At the urging and insistence of Leesona, the Canadian judge ruled that

> The fact that Mr. Seem and Mr. Stoddard continued to work on [the bench model] and its accompanying equipment and make further experiments does not affect the fact that they had made the invention of the apparatus defined in Claim 3 at the asserted date. They were obviously anxious to make improvements. When they had satisfied themselves, as they did, that they could use the apparatus that they had invented to produce very satisfactory stretch nylon yarn that was permanently crimped and more uniform in appearance than nylon yarn produced by the step-by-step process and that knitted fabric made from it could stand washing and boiling and still maintain its uniform crimp they proved that it was possible to put their invention into full scale commercial operation when they completed the false twist conversion of the 10 spindles of the 40-spindle up-twister that they had borrowed from the Fletcher Works. In my opinion, the 10-spindle false twist conversion that was completed in July, 1950, was simply a full scale commercial exemplification of

the invention that Mr. Seem and Mr. Stoddard had made in July, 1947 or shortly thereafter.

*Exchequer Opinion* at 29–30.

Leesona further made the representation that

> By the latter part of July 1950 Seem and Stoddard had converted ten positions, or spindles, of this machine to false twist operation. This machine, constructed in July of 1950, include[d] all of the elements of Claim 3 of Patent 552,105 [Canadian counterpart of '105] and its operation practice[d] the process of Claims 1, 2, 3, 5 and 8 of Patent 552,104 [Canadian counterpart of '109] . . . . This 1950 machine produced very satisfactory permanently crimped stretch nylon.[15]

There are many other examples of actions and statements by the Permatwist partners, although not recited here, that conclusively establish that the practice of the invention prior to 1952 was "mainly for the purposes of trade and profit, and the experiment [was] merely incidental to that . . . ." Smith & Griggs Mfg. Co. v. Sprague, 123 U.S. 249, 256, 8 S.Ct. 122, 126, 31 L.Ed. 141 (1887). *See* Pickering v. Holman, 459 F.2d 403, 406 (9th Cir. 1972). Any material fact raised by that question, if indeed there is one, cannot be disputed.

e). Next Leesona argues that a jury must decide "[w]hether the first 220-spindle machine converted in the basement of Marionette Mills, Inc., (a) was used as part of a sales program or (b) was used only in connection with continuing experimentation and development of the false twist process." This question cannot justify a denial of the motion. If the Court were to assume that the two subparts were mutually exclusive, as they were obviously designed to be, then of course it would have to instruct the jury that it must find the existence of subpart *a* since Leesona has

---

15. Exhibit 3 to Sauquoit Fibers Motion for Partial Summary Judgment at 17. [hereinafter referred to as Sauquoit Exhibit]

already admitted that the machine was used to establish a business relationship with Synfoam. However they need not be mutually exclusive but for the use of the word "only"—one may use an invention as part of a sales program while continuing experimentation. Even in that instance, though, the question would not be relevant unless subpart (b) was worded in this fashion:

> (b) was used primarily in connection with continuing experimentation and development of the false twist process related solely to the patented features of the invention and only incidentally for trade and profit.

With the question posed thusly, analysis of this material fact can be examined to see if a dispute is justifiable. There is no question that the 220-spindle machine embodied the inventions in litigation here. In many instances, either in previous depositions or pleadings, the Permatwist partners have acknowledged the identity of the two. The 220-spindle machine was, after all, the machine used by them to demonstrate the invention to Synfoam.[16] Even if that were not the case, the failure to controvert the material fact that the machine would constitute an infringement if used during the life of the patents affirmatively establishes the embodiment. In the Canadian litigation Leesona argued to the Court that

> . . . Construction of the single 220 spindle machine was started early in 1951 and was completed the early part of 1952 in that basement. The machine still remains in the basement in operation in the same location it had when completed early in 1952.[17]

The Court adopted that argument when it noted that the machine was "completed in the spring of 1952. . . . And it [was] clear that on May 20, 1952, the date of the secret disclosure, Mr. Seem showed the machine in operation to the representatives of Synthetic Yarns Inc. and described its parts."[18] These representations by Leesona were not made without the consent of the inventors, but were based on the testimony given by Mr. Seem and his partners in that litigation.[19]

▮▮▮▮ Leesona cannot have it both ways. It has not only failed to show that the continuing experimentation on the false twist process related to the invention revealed in these patents, but it has utterly ignored the cardinal prerequisite that any use for trade and profit be only incidental to the experimental use, if any.[20]

f). The sixth question posed by Leesona in its opposition to the two separate motions for partial summary judgment involves the demonstration of the 220 spindle machine to the four representatives of Synthetic Yarns on May 20, 1952—was it carried out in secret? The issue is legally irrelevant to the motion by the New York plaintiffs; they rely only on the fact that the invention was on sale and the *Hobbs* decision makes it crystal clear that secrecy is just not a consideration.

. . . His argument is basically an attempt with no support from precedent to construe the statute so that "public" in the phrase "in public use or on sale" modifies not only "use" but also "sale". This unrealistic construction has been urged elsewhere and rejected. Piet v. United States, 1959, S.D.Cal., 176 F.Supp.

---

16. *Sauquoit Exhibit* at 11.

17. *Sauquoit Exhibit* at 21.

18. *Exchequer Opinion* at 30–31.

19. Memorandum of Points And Authorities In Support of New York Plaintiffs' Motion for Summary Judgment at 16.

20. The Ninth Circuit Court of Appeals has remarked recently that "[a] bona fide experimental use involves *no* commercial exploitation." Pickering v. Holman, 459 F.2d 403, 406 (9th Cir. 1972) (emphasis supplied). While this may be somewhat strong, it nonetheless serves to emphasize the duty of the patentee to come forward to dispel any doubt concerning the invention's use for trade or profit.

576, aff'd 9 Cir. 1960, 283 F.2d 693. We cannot attach any relevance to any conditions of secrecy which may have existed at the time the G valve was placed "on sale." [7]

7. Secrecy may be relevant to the issue of "public use." *See* Kardulas v. Florida Machine Products Co., 5 Cir. 1971, 438 F.2d 1118; Watson v. Allen, 1958, 103 U.S.App.D.C. 5, 254 F.2d 342.

451 F.2d at 860.

As the above quote indicates, the Court states that the issue "may be" relevant to the motion by Sauquoit, relying as it does on both the "on sale" and in "public use" provisions of § 102(b). In this instance, however, whether the demonstration was carried out in secret is both irrelevant and immaterial; and can be no justification for denying the motion as it relates to the "public use" defense. Leesona argues that there cannot be a "public use" when the disclosure was protected by securing a promise of secrecy, citing both *Kardulas* and *Watson, supra*. *Kardulas* is not authority for this statement. Judge Dyer remarked there that

. . . The use may be public where it is exposed to persons other than the inventor, including customers and salesmen, who are under no obligation of secrecy, Watson v. Allen, . . . and where no attempt is made to keep the device from the knowledge of the public.

438 F.2d at 1123–1124. This obviously was not the holding of that case, and does not necessarily support the converse of the statement, i. e., that a use may not be public where it is exposed to persons other than the inventor who are under an obligation of secrecy. That comment in *Kardulas*, intended as a short introduction to the law of public use, was correct as far as it went, but just did not go far enough. The citation to *Watson* is also of no help. Judge Burger (now Chief Justice) stated, in an attempt to summarize the law on public use, that

. . . It may be fair to conclude that public use exists where the invention is used by, or exposed to, anyone other than the inventor or persons under an obligation of secrecy to the inventor.[8]

254 F.2d at 345. In the footnote to that sentence, it continued:

8. Use by persons under an obligation of secrecy to the inventor is probably not public use. See National Tube Co. v. Steel & Tubes, Inc., 3 Cir., 1937, 90 F.2d 52. Cf. Journeaux, Public Use in Private or Vice Versa, 23 J. Pat.Off.Soc'y. 514 (1941), who states "With due caution it may be considered that an invention is in public use when it is used openly by the inventor for its intended purpose and also when it is used by anyone beyond the control of the inventor." . . .

254 F.2d at 345. Not only was this dicta, because the Court went on to hold that the use in question was still experimental [primarily?], but the dicta was clearly labelled as such by insertion of the word "probably" in the footnote. Obviously Journeaux's admonition to use "due caution" in stating a test for establishing a public use was not heeded—his summary does not even mention secrecy as an element.

The *National Tube* case cited in that footnote did make the following finding in a similar situation:

. . . This testimony reveals that Mr. Smith, a representative of Johnston, demonstrated to him several small pieces of tubing manufactured by the Johnston process *without, however, disclosing the process.* These demonstrations were made preliminary to the execution of a contract with Mr. Simmons in which he was given exclusive right to use these inventions in the manufacture of bedsteads and allied articles. The process was disclosed to Mr. Simmons in the contract which bound him to secrecy. The showing of these pieces of tube to Mr. Simmons and the demonstration of their fitness for his use *without disclosing the process* did not amount to public use. The defendant did not bear the burden required of him in establishing prior public use for more

than two years prior to the application for the patent. The Barbed Wire Patent, 143 U.S. 275, 285, 12 S.Ct. 443, 450, 36 L.Ed. 154.

90 F.2d at 54 (emphasis added). Because the process was not disclosed, the finding loses much of its impact here. In any event, the case appears to have been overruled *sub silentio* in U. S. Chemical Corp. v. Plastic Glass Corp., 243 F.2d 892 (3d Cir. 1957) where, prior to the *Watson* decision, the panel, by Chief Judge Biggs, adopted the Second Circuit's view of the "public use" defense when it said:

> The issue is what is a public use or sale within the purview of the statute. This question was cogently discussed by Judge Learned Hand in the Metallizing Engineering Co. case, supra. We can add little of value to what Judge Hand said in the cited decision. We are in accord with what he stated.
>
> . . .

243 F.2d at 894.

As was discussed earlier, one of the statements made by Judge Hand in the *Metallizing* case was that the public use defense has two facets: (1) it exists when anyone, the inventor or a third party, practices the invention in a non-secret, nonexperimental fashion prior to the critical date; or (2) it exists when the inventor practices the invention for trade or profit whether the use has been secret or not. Metallizing Engineering Co., 153 F.2d at 520. *See* Robine v. Apco, Inc., 386 F.2d 267, 269 (2d Cir. 1967); Macbeth-Evans Glass Co. v. General Electric Co., 246 F. 695 (6th Cir. 1917). Judge Hand went on to say:

> It is indeed true that an inventor may continue for more than a year to practice his invention for his private purposes or his own enjoyment and later patent it. But that is, properly considered, not an exception to the doctrine, for he is not then making use of his secret to gain a competitive advantage over others; he does not thereby extend the period of his mo-

nopoly. Besides, as we have seen, even that privilege has its limits, for he may conceal it so long that he will lose his right to a patent even though he does not use it at all.

153 F.2d at 520. That certainly is not the situation here.

 Whether the disclosure to the Synthetic Yarn representatives on May 20, 1952 was secret or not is irrelevant to a decision on either of the two motions, so this question is not a material fact in issue.

g). Question No. 7:

> Whether the demonstration of the 220-spindle machine to representatives of Synthetic Yarns, Inc., on May 20, 1952, was part of a sales effort or (b) was for the purpose of obtaining additional assistance to aid in further development of the false twist process.

This proposed "material issue" suffers from the same malady affecting question 5. Subpart *b* should read:

> (b) was used for the purpose of obtaining additional assistance to aid primarily with continuing experimentation and further development of the false twist process related solely to the patented features of the invention and only incidentally for trade or profit.

This, however, is not the only fatal disease infecting the question. By constructing the question in this way Leesona hopes to make the subparts mutually exclusive, when in fact they need not be. The demonstration could have been part of a sales effort, but the "on sale" defense wouldn't materialize unless the invention was through the experimental stage. The sales effort is conceded. The only remaining portion concerns whether the demonstration was made in hopes of "obtaining additional assistance to aid with continuing experimentation . . . related solely to the patented features of the invention . . . ." The burden is on Leesona to establish the experimental exception and it has not met that burden.[21]

---

21. *See* pp. 80–81 *supra*.

. . . But for this [experimental] exception to be applicable, the use must be an experiment on the patented device itself and not a use of the patented device in connection with experiments on other devices. A. Schrader's Sons, Inc. v. Wein Sales Corp., 9 F.2d 306 (2 Cir. 1925). Once it has been established that the invention itself functions satisfactorily, the one-year limit on commercial use applies, and the inventor should not be allowed to evade this limit by performing further tests on nonpatented features of the machine in which his invention is incorporated.

Robine v. Apco, Inc., 386 F.2d 267, 269 (2d Cir. 1967). The evidence relied on by Leesona is really no evidence at all—it amounts to nothing more than a citation to a law review note that states

. . . In a borderline case where it is unclear whether the invention has been reduced to practice, the inventor's purpose becomes an important consideration.

Note, New Guidelines for Applying the On Sale Bar to Patentability, 24 Stan.L. Rev. 730, 744 (1972), and the recent deposition testimony of the Permatwist partners and their associates. The Ninth Circuit said it all when it affirmed a summary judgment of invalidity in Super Mold Corp. v. Clapp's Equipment Division, Inc., 397 F.2d 932, 934–935 (9th Cir. 1968):

Super Mold admits the facts as recited above [concerning a sale to Sears], but it claims, notwithstanding, that [the inventor's] testimony in his deposition that "[t]he sale and use of my thread aligners to Sears was a good faith use for experimental purposes and not a public use" created a genuine issue of material fact. We cannot agree. . . . [The inventor's] testimony concerning his subjective intent has no probative force when weighed against the overwhelming objective evidence to the contrary.

See, e. g., Smith & Griggs Mfg. Co. v. Sprague, 123 U.S. 249, 8 S.Ct. 122, 31 L.Ed. 141 (1887); Atlas v. Eastern Air Lines, Inc., 311 F.2d 156, 160 (1st Cir. 1962); Minnesota Mining & Mfg. Co. v. Kent Industries, Inc., 274 F.Supp. 993, 998 (E.D.Mich.1967).[22]

22. The self-serving comments of the inventors should be given even less weight when those associated with them disclaim any independent recollection of occurrences or conversations taking place during the time frame in question. Although extended citation to the many deposition pages of the numerous witnesses deposed during this discovery period to indicate just how pervasive the lapse of memory has been would serve little purpose, one example may prove illuminating. This colloquy took place concerning events in 1966, but it amplifies a condition that has been more or less symptomatic throughout the entire discovery process.

THE COURT: Mr. _____, it is perfectly proper for Mr. Irons to keep repeating these questions because either you are not being candid and forthright in your testimony when you testify to a total lack of recollection or your total lack of recollection would raise serious doubt about your competence to serve as an attorney.

Now, I do not want you to argue with Mr. Irons any more. If he repeats a question a second or third time, simply answer it. I need no observations from you as to whether the questions are repetitious.

Now, I would also suggest to you that you be a little more honest in your testimony here.

THE WITNESS: Your Honor, I am being perfectly honest.

THE COURT: I am noting for the record that insofar as my observation is concerned, you are not being candid. Now, you will simply continue to testify.

THE WITNESS: Your Honor, I resent that. I am being perfectly honest.

THE COURT: You may resent it, Mr. _____. I am suggesting to you that you are not being candid and forthright.

THE WITNESS: And I think you are being perfectly unfair in accusing me of being dishonest about my recollection of what happened in 1966, Your Honor. I have tried to be as honest as I can possibly be in these proceedings, and I have no recollection of what I did six years ago.

THE COURT: Fine, then you continue so to testify. I am noting for the record my observation that in my

h). The eighth proposed material fact issue fails for the same reason that the fifth and seventh proposed issues fail. For the question to be of any relevance at all it must focus in on the experimental exception, and that it does not do. Even if it did, however, it is impossible for Leesona to show that that exception has any application to these activities. *See* subparts e and g *supra.*

i). Question 9, concerned as it is with whether the uses of the patented process prior to the critical date were in secret is irrelevant under the law of "public use", since the uses were commercial in nature. *See* subpart f *supra.*

j). The next question relates primarily to the "public use" defense. It is directed to a determination of whether or not the apparatus and/or process were used in commercial production before the critical date. Leesona states that "[i]f the quality of the yarn was not suitable for successful use in garments, the inventions were not commercially viable." With this test in mind, the Court need only look at Leesona's arguments to the Canadian court:

It is abundantly clear from the agreement signed May 20, 1952 by the four employees of Synthetic Yarns Inc., Z–166, that a machine was in being and operating at Marionette Mills, Coatesville, Pennsylvania, on May 20, 1952. It is also clear that that machine was a false twist machine for the manufacture of stretch yarn by a continuous process. That the machine and process were success-

ful is established by the fact that Synthetic Yarns Inc. arranged for the purchase of six machines and The Permatwist partners decided to build seven additional machines to complete the installation they originally contemplated. (Seem, Vol. 27, p. 3696, 1.-3–12.) As further proof of the existence of this machine, defendant entered as its Ex Z–163, Z–164 and Z–165 samples of fabric knit from yarn produced on the 220 spindle machine in the early summer of 1952. . . .[23]

Based on these and many similar arguments made by Leesona in that litigation the Court made the finding quoted on pages 83 and 84 supra. If the commercial status of the apparatus or process is material to either test, it certainly is not in doubt. Both were in commercial use prior to the critical date.

k). The final question posed by Leesona is

11. Whether the dealings of the Permatwist partners with Archibald Graustein, Synthetic Yarns, and Synfoam Yarns constituted (a) an effort to sell the Stoddard and Seem false twist process or (b) an effort to obtain financial and experimental assistance to complete development of the inventions.

If the reader notes a distinct feeling of *deja vu,* he should not be alarmed. This is essentially a rehash of question number eight, which is in turn disposed of by questions five and seven. The one new aspect of this question seems to be

view you are not being candid and forthright in your testimony. If you persist, that is your answer, you do not recollect.
You may continue, Mr. Irons.
 * * * * *
THE WITNESS: Your Honor, with all due respect, and this is why I think that maybe we are having a problem here, I have just been handed an agreement that I have not reviewed—as I say, I have never ever in my life been accused of being dishonest.
THE COURT: You have been accused today either—
THE WITNESS: Yes, sir, the first time in my life.

THE COURT: —either of lacking forthrightness and candor in your testimony or of suffering from such a lack of recollection that it raises serious doubt as to your competence to serve as an attorney, and I stand on that. You may take all the time you wish to review that document.
THE WITNESS: Sir, you do not understand, maybe I—
THE COURT: I am simply suggesting to you you take the time that it takes to review that document in order to be able to answer the question.

23. *Sauquoit Exhibit* at 23–24.

the implication that a sale that amounts to an "effort to obtain financial and experimental assistance" negates the statutory "on sale" bar or brings the activity within the experimental use exception. To justify this necessary implication, Leesona cites a 1964 Court of Claims decision, Ushakoff v. United States, 327 F.2d 669, 164 Ct.Cl. 455 (1964), and a recent student article in the Stanford Law Review to the effect that:

> . . . If the inventor offered to sell the invention in order to gain a competitive advantage, it was probably complete; if, however, he was merely seeking funds to enable him to reduce the invention to practice, it probably was not complete.

*Note, supra* at 744.

At first glance this statement may appear to be a radical departure from the law governing the "on sale" bar, but a little reflection will indicate that it is nothing more than rephrasing of that comment in *Hobbs* quoted earlier in this opinion:

> The mere existence of a sales contract is insufficient to establish a placing "on sale". The invention that is the subject of the sale must be a reality in the sense that it must be beyond the stage of experimentation. . . .

451 F.2d at 859. If Leesona can just show that the apparatus and/or processes were in the experimental stage, there can be no "on sale" bar. But alas, Leesona can no more make that showing to qualify question 11 as a material fact in dispute than it could make the same showing for questions three, five, seven, eight or ten.

## CONCLUSION

The pleadings and exhibits filed in this cause are quite voluminous. Nevertheless the Court has made a diligent effort to review the memoranda, depositions and exhibits in order to familiarize itself with the facts and the law. One should not infer that the omission of any particular argument from this opinion means that the argument was ignored or not considered. Rather it only means that not every point raised could be dealt with directly and still keep this opinion within manageable boundaries.

Accordingly, it is ordered and adjudged that United States Letters Patent 2,803,105, 2,803,108, and 2,803,109 shall be and they hereby are declared to be invalid because they were "on sale" and in "public use" more than one year prior to the date of the application for patent in the United States.

APPENDIX A

Aug. 20, 1957 N. J. STODDARD ET AL 2,803,108

METHODS OF PROCESSING TEXTILE YARNS

Filed Jan. 4, 1954 3 Sheets—Sheet 1

FIG. 1.

FIG. 4.

INVENTORS:
Nicholas J. Stoddard &
Warren A. Seem,
BY Paul & Paul
ATTORNEYS

FIG. 2.

FIG. 3

INVENTORS:
Nicholas J. Stoddard &
Warren A. Seem,
BY Paul & Paul
ATTORNEYS.

Aug. 20, 1957 N. J. STODDARD ET AL 2,803,108

METHODS OF PROCESSING TEXTILE YARNS

Filed Jan. 4, 1954 3 Sheets-Sheet 3

FIG. 5.

FIG. 6.

INVENTORS:
NICHOLAS J. STODDARD
WARREN A. SEEM
BY Howson & Howson
ATTYS.

# United States Patent Office

2,803,108

Patented Aug. 20, 1957.

**1**

**2,803,108**

**METHODS OF PROCESSING TEXTILE YARNS**

Nicholas J. Stoddard, Berwyn, and Warren A. Seem, Chester Springs, Pa., assignors, by mesne assignments, to Universal Winding Company, Cranston, R. I., a corporation of Massachusetts

Application January 4, 1954, Serial No. 401,803

11 Claims. (Cl. 57—157)

This invention relates to thermoplastic textile yarns and methods of processing them. More particularly, it is concerned with polyamide and other thermoplastic yarns including nylon, Vinyon, Orlon, Velon, Dacron, Saran and the like (as distinguished from yarns of cotton, linen, rayon, silk, wool and the like), and to methods of thermally shrinking, thermally stretching, thermally processing and/or thermally stabilizing such synthetic yarns by thermal treatment with incidental winding, twisting, twisting and untwisting, plying, coning, copping, nubbing, drying, dyeing, coating, singeing, sizing, and other normal processing operations, with the aforesaid thermal operations uniformly carried out to substantially whatever degree desired or required and simultaneously with normal yarn processing operations.

In processing polyamides and other thermoplastic chemicals of the kind referred to after conversion into yarns to render them suitable for use in weaving, knitting and other textile operations, it has been the common practise to utilize heat in many forms such as steam, hot liquids and hot vapors to thermally shrink, thermally stretch, thermally stabilize and otherwise thermally treat the yarn, all such operations being carried out before, after or between normal operation or as separate and independent, thermal operations. For example, to set the twist or stabilize the torsional forces after twisting, pretwisted thermoplastic yarns wound upon rigid or sometimes collapsible cores were heretofore placed in a heated chamber. On the other hand, to shrink thermoplastic yarns, they were subjected to heat after having been wound into skeins, or upon collapsible cores, or loosely upon rigid cores, and again subjected a second time to heat after rewinding. To stretch completed thermoplastic ply yarns or cords it has been necessary heretofore to resort to a separate thermal stretching operation, and for impartation of dimensional stability, to subjec the yarns to heat after winding upon a rigid core, and in some instances, to rewind and again heat treat the yarns.

It has also been the common practice in the past to wind thermoplastic yarns into skeins and to place the skeins into a closed heated treating chamber for shrinking and stabilizing the yarns. Here again, when the shrinkage desired was not consistent with the heat necessary for a relatively high amount necessary for thermal stabilization, and additional operations were therefore required in the processing.

When thermoplastic yarns were shrunk as heretofore by subjection to heat after being wound upon collapsible cores, or after being loosely wound upon rigid cores with a second heat treatment after re-winding, one to four extra operations were involved in the treatment. Because of the rigidity of the cores, and the varying resistance to collapsing of the previously wound yarn layers, uneven shrinkage or contraction of the yarns took place throughout the packages, and, as a consequence the treated yarns varied in physical characteristics, i. e., in appearance, denier, size, dyeing properties, elongation, elasticity, strength, residual shrinkage, torsion and the like, these

**2**

variations and imperfections being carried through into the fabrics ultimately made from the yarn.

In the production of fish lines, nets and the like, for example, by prior art methods, the thermal stretching was done as a separate step after previous processing operations, but likewise without attainment of uniformity in the physical characteristics of the finished yarns.

In another prior art procedure for the purpose of attaining dimensional stability, thermoplastic yarns wound upon rigid cores were heat treated, and sometimes again rewound upon rigid cores and again heat treated. Notwithstanding these heat treatments, the processed yarns lacked uniformity in physical characteristics due to uneven shrinkage as between the inner and outer windings of the yarns on the cores and subjection of the outer windings to the heat for a longer time period than the inner windings during each heat treatment.

Definite irregularities (such as in appearance, denier, size, dyeing properties, yield value, contractile force, elongation, elasticity, residual shrinkage, torsion, strength, and the like) exist in packaged thermoplastic yarns as they come from the producer. These irregularities are due to many uncontrollable conditions during initial conversion of the thermoplastic chemicals into yarn strands, i. e., they are occasioned by variations of tension in the spinning, stretching and packaging operations, by lengthening and/or shortening of the yarns under changing conditions of temperature and humidity, and by variations in restraint upon the different layers of the yarns in the packages. Such imperfections cause, in fabrics and other products made from the yarns, corresponding irregularities which detracted from the appearance of the products, and frequently precluded use of the yarns in certain products of manufacture. In other cases the heretofore conventional yarn processing tended to accentuate the irregularities and/ or cause more pronounced imperfections which further impair the quality of the products manufactured from the yarns, or additionally precluded their use in certain products.

Subjection of thermoplastic yarns to high temperature for prolonged periods of time causes considerable heat degradation. For shrinking and/or stabilization of thermoplastic yarn in packages as has been the common practice heretofore, the packages were exposed in a heated chamber for an hour or more depending upon the size of the packages, the density of the windings and the circulation of the air in the chamber. It has been determined that the loss in tenacity of nylon yarn subjected to a temperature of 284° F. for prolonged periods varies roughly as the logarithm of the time exposure, and when subjected to this temperature for an hour the yarn loses about 4% in tenacity, in two hours it loses about 8%, and in eight hours it loses about 24%. Accordingly, when nylon or other thermoplastic yarns are treated by the usual prior art methods they vary in tenacity and in other physical characteristics from the inside to the outside of the packages.

Thus, the processing of thermoplastic yarns by these prior art methods in preparation for weaving, knitting, or other uses entailed resort to numerous separate treating steps as well as frequent intermediate handlings of the yarns, all of which were painstaking, time consuming and expensive and so added very considerably to the cost of the yarns. Moreover, the results were generaly unsatisfactory from the standpoint of uniformity due to the difficulty of maintaining the temperature, to which the yarns were subjected, constant for a uniform time during the various separate treatments.

The chief aim of our invention is to overcome the here-in pointed out drawbacks in the prior methods of processing thermoplastic yarns in preparation for use in the manufacture of woven, knitted and other textile prod-

**3**

ticts, and to make possible the economic production of thermoplastic yarns which are uniform throughout as regards their physical characteristics. This objective is realized, in practice, as hereinafter more fully disclosed, through provision of a simple and reliable method whereby improved uniformly processed thermoplastic yarns are produced in quantity in a rapid continuous manner at greatly reduced cost. Our method of processing provides the presence of heat and correlated yarn tension which we have discovered to be even more important for the best processing of thermoplastic yarn than the established practice of regulating relative humidity during the processing of other than thermoplastic yarns. This is broadly accomplished by introducing in the path of travel of the yarn during winding, twisting, twisting and untwisting, plying, coning, copping, nubbing, drying, dyeing, coating, singeing, sizing or the like, a thermally insulated regulatable restricted heated zone together with a regulatable yarn tension device; and then uniformly heating the traveling yarn under correlated tension.

Other objects and attendant advantages will appear from the following detailed description when considered in connection with the attached drawings, wherein:

Fig. 1 is a fragmentary view, in front elevation, of an exemplary apparatus suitable for processing thermoplastic yarns in accordance with our improved method.

Fig. 2 is a fragmentary view in vertical section, taken as indicated by the angled arrows II—II in Fig. 1 and drawn to a larger scale, showing one type of a specially designed heating device embodied in the apparatus.

Fig. 3 is a detail sectional view taken as indicated by the angled arrows III—III in Fig. 2, and showing one type of a specially designed device by which the yarns are maintained under tension during the processing.

Fig. 4 is a view like Fig. 3, showing another form of a specially designed tensioning device.

Fig. 5 is a fragmentary view in front elevation of a modified form of the apparatus which is suitable for dyeing and chemically sizing thermoplastic yarns; and

Fig. 6 is a side elevational view of the apparatus disclosed in Fig. 5.

It is to be pointed out that we do not limit our process to the two types of tension devices shown in Fig. 3 and Fig. 4 since it is obvious that many variations in design are possible without departing from the invention. The basic requirement for a tensioning device to be utilized in our process is that it be capable of applying the required yarn tension uniformly.

The apparatus illustrated in Fig. 1 is basically what is ordinarily known in the textile art as an "up-twister" such as is commonly used in twisting operations, one of the usual multiple spindles for a wound package P of unprocessed yarn being indicated at 2, the traverse rail for the corresponding distributing guide 3 being indicated at 4, a usual drive roll for the collecting spool S being indicated at 6, and the rotary shaft of said roll being indicated at 7. Spindle 2 is rotated by tangential contact of its diametrically enlarged lower portion 8 with a running belt 9.

In converting the apparatus for the purposes of our invention, we arrange in the interval between the spindle 2 and the traverse guide 3, a heating device 10, and a yarn tensioning means 11 along the line of upward travel of the thermoplastic yarn Y, i. e., upwardly from the supply package P to the collecting spool S. As presently explained, the device 10 is electrically heated, current being conducted to it through two fixed horizontal bus bars 12 and 13 whereto said device is secured, with interposition of insulation bushings at 14, by screws 15 and 16 as best shown in Fig. 2. The required degree of heat is uniformly maintained in the device 10 by current at a constant voltage (not exceeding twenty-four volts for personal safety) through an automatic induction voltage regulator 17 from a power line 18, 19, said regulator being connected by conductors 20, 21 to a manually adjustable

**4**

induction voltage regulator 22 connected in turn by conductors 23, 24 to the primary of a step down transformer 25 in circuit through conductors 26, 27 with the bus bars 12, 13. The output voltage of the induction voltage regulator 17 is automatically governed by a thermally responsive sensing means 28 incorporated in the heating device 10. The automatic and the manual voltage regulators 17 and 22 and the thermostatic sensing means 28 may all be of any approved standard and commercially available types by cooperation of which the temperature in the heating device 10 is modulated compensatively with changes in ambient or room temperature and transfer of heat to the travelling yarn. Also included in the lines 18, 19 and 20, 21 respectively, are suitable manually operable safety hand switches 29 and 30.

As shown in Fig. 2, the heating device 10 comprises a central tube 32, of non-ferrous material and of small diameter and bore, through which the yarn Y is passed, said tube being exteriorly coated as at 33 with glass or other electrical insulation, and surrounded by a coil 34 of resistance wire. As further shown, tube 32 is embedded in a thick walled jacket 35 of thermal insulation which may be of fiber glass Sil-O-Cel granules or the like encased in a metallic shell 36. At its opposite ends, the shell 36 is closed by covers 37 which also may be of metal, with interposition between them and the heat insulating jacket material 35, of disks 38 of transite or the like to minimize thermal transfer from the hot tube 32 to said shell and vice versa. Engaged over the opposite ends of tube 32 and passing through the disks 38 are hard wear-resistant bushings 39 which may be of porcelain or the like, to prevent cutting of the tube by the yarn passing through it. It is to be particularly noted that the winding pitch of the heating coil 34 increases progressively from the bottom end of the tube 32 at which the yarn enters, to the mid height of the tube, and that it progressively decreases toward the end at which the yarn emerges. As a result, a greater amount of electric energy is available at the entrant and at the exit ends of tube 32, thereby making possible the maintenance of the desired uniform elevated temperature throughout the tube and the use of a much shorter tube than otherwise would be required. The lead 40 from one end of coil 34 is extended through the cover 37 to the screws 15, and the lead 41 from the other end of said coil to the screw 16. Interposed in lead 40 is a hand switch which is diagrammatically indicated at 42.

We do not limit our process to the use of the one design of heating device shown as 10 in Fig. 2 since it is obvious that many variations in design are possible without departing from the invention. The heating device shown as 10 in Fig. 2 is very practical for our process since it is capable of supplying uniform ($\pm 1\%$) heat up to the melting point of the yarn without materially affecting room temperature.

The tensioning or restraining means 11 comprises, in this instance, a small V grooved wheel 45 about which one or more turns of the yarn Y are wrapped, said wheel being revolvable about the laterally bent end of a supporting shank member 46, and is engaged by a friction disk 47 which is backed by a compression spring 48, the force of the latter being finely regulatable by means of a thumb nut 49. As best shown in Figs. 2 and 3, the shank member 46 extends through a vertical slot 50 in a bracket bar 51 of metal suspended from bus bar 13, and is fixable after adjustment up or down and in and out by means of the clamp nuts indicated at 52. Arranged below the tensioning means 11 and similarly supported by the bracket bar 51 with capacity for both up and down and in and out adjustment is a pigtail guide 53 for the yarn Y, said guide being fixable in adjusted position by clamp nuts 54.

Again referring to Fig. 1, it will be noted that the thermoplastic yarn Y from the supply package 1 is threaded upwardly through one eye of the flyer 55 as-

sociated with spindle 2, then through the stationary guide 53, then one or more times about the wheel 45 of the tensioning means 11, then through the tube 32 of heating device 10, and finally through the traverse guide 3 enroute to the collecting spool S.

In the operation of the apparatus to carry out our improved processing method, the yarn Y is drawn upward at a uniform linear speed from the supply package P on spindle 2 by the pull of the rotating take-up spool S, being maintained all the while under a predetermined constant tension by the tensioning device 11 in the interval between the latter and said take-up spool as it traverses the heating device 10. In the interval between the revolving supply package P and the wheel 45, the yarn is twisted by rotation of said package. As the yarn traverses the heating device 10 immediately after being twisted, it is softened or plasticized, and by cooling, after emergence from said device on its way to take-up spool S, it is thermally stabilized and the twist, previously inserted, is set. By this it is meant that the yarn is yarn-set, that is, the molecules in the thermoplastic yarn are permanently and uniformly reoriented or realigned therein according to the physical configuration of the yarn at the time of yarn-setting so that the individual filaments of the yarn have an inherent tendency to retain or assume the physical configuration which they had at the time of yarn-setting. By adjusting the thumb nut 49 the resistance to free rotation of the wheel 45 can be varied to keep the tension at less than the contractile force of the yarn to shrink and stabilize the yarn, to maintain the tension equal to the contractile force of the yarn when stabilization only is desired, or to increase the tension beyond the contractile force of the yarn to stretch and stabilize it.

During the processing, the temperature in the heating device 10 is maintained at a definite prescribed degree, depending upon the adjustment of the manual induction voltage regulator 22, and modulated compensatorily with changes in ambient or room temperature and transfer of heat to the travelling yarn through influence of the thermostatic sensing means 23 in said heating device upon the automatic induction voltage regulator 17. By reason of the thick thermal insulation surrounding the coil 34 of the heating device 10, a very little thermal transfer actually can take place between the yarn tube 32 and the outside atmosphere. As a consequence, the required degree of yarn treating temperature is uniformly maintained in the restricted zone defined by the heating device. By adjusting the tensioning device 11, the tension to which the yarn is subjected can be accurately correlated with the effective treating temperature and the constant linear speed of travel of the yarn under the pull of the rotating take-up spool S. It is to be understood that the temperature will be adjusted in accordance with the requirements of the particular kind of thermoplastic yarn which is to be processed, and the tension adjusted in accordance with the characteristics desired in the finished yarn.

The effect of heat upon the different thermoplastic yarns now in commercial use is generally known and can be readily determined for new thermoplastic yarns. For each particular thermoplastic yarn various temperatures have a definite effect upon shrinkage, stabilization, tenacity, yield under stress, contractile force, elasticity, breaking elongation and other physical characteristics. By correlation of a uniform prescribed heat and imposition of very little tension, in accordance with our invention, maximum shrinkage will be permitted to take place uniformly throughout the length of the yarn. By applying tension just equal in degree to the contractile force of the yarn at the given temperature, neither shrinkage or stretching will take place; while by applying high tension, maximum stretching will take place throughout the length of the yarn. Thermoplastic yarn treated in accordance with our new method takes dyes evenly, and greater permanency and depth of color result from the uniform heating at

the elevated temperatures with increase in tenacity and in the modulus of elasticity of certain types of thermoplastic yarns.

In carrying out our improved processing method it is essential, as already been pointed out, that the speed of linear travel of the yarn through the restricted heating zone 10 must bear a definite relation to the extent of heat transfer to the running yarn. We have found it to be a simple matter to predetermine the extent of thermal transfer in the restricted heating zone to a particular yarn at any given temperature and any given speed of travel. For example, with a temperature of 485° F. maintained in the heating zone, 200 denier nylon yarn run through said zone at the rate of 600 inches per minute will shrink 8%. Since it is known that a dry temperature of 400° F. is required to shrink 200 denier nylon by the same amount, it is evident that the effective temperature in the heating device for that particular yarn and linear speed of travel must be 400° F. It is to be understood that by "effective temperature" we do not necessarily mean the temperature in the heating zone, but rather to the temperature required to obtain a given effect on the particular thermoplastic yarn involved if said yarn were not travelling but mearely heated to that temperature. Thus, by our improved method, it is possible to predetermine thermal shrinking, thermal stretching, thermal processing and/or thermal stabilization to any desired extent within the limits of the characteristics of the particular yarns, with or without incidental twisting as may be desired by regulation of the yarn tension and the temperature of the restricted heated zone. With many types of thermoplastic yarns, the presence of moisture adds substantially to the effectiveness of the heat at a given temperature in the processing. To those familiar with the art, it will be evident that it is a simple matter to adequately wet out the running yarn with water or other liquid solution of effective chemicals prior to passage of the yarn through the restricted heating zone.

In our improved method of processing, it is no longer necessary to accept as unavoidable and to make the best of many of the undesirable and thermal characteristics of processed thermoplastic yarns. Rather, our improved method makes it possible to economically process thermoplastic yarns with utilization of the maximum thermal qualities and improvement of their physical properties.

A few examples are given below of the procedures followed according to our invention in the processing of thermoplastic yarns for different purposes and uses.

To prepare nylon yarn for use in the welts of ladies stockings, the manual voltage regulator is adjusted to provide an effective temperature in the heating device 10 of 250° F. more or less depending upon the temperature used in subsequently preboarding of the hosiery in the usual way, adjusting the tensioning device, and running the yarn in the apparatus after the manner previously described, whereby the yarn is twisted, uniformly shrunk, stretched and/or stabilized to the degree desired. Thermoplastic yarn so processed will lend itself to be formed into uniform stitches by the needles of the knitting machines because it is set and molded to substantially smooth or rod shaped form. If, in the processing, the running nylon yarn is subjected to an effective temperature of 350° F. in the heating device, a tension of less than 0.4 gram per denier will cause the yarn to shrink while being twisted and thermally stabilized. Maintenance of a tension of more than 0.4 gram per denier, with other conditions remaining the same, will result in stretching of the yarn as it is twisted and stabilized; while under a tension of approximately 0.4 gram per denier, the yarn will simply be stabilized as it is twisted, without either shrinking or stretching. This continuous procedure is thus simple as compared with the prior art slow methods of thermoplastic hosiery welt yarn processing which involved the separate stages of redrawing the nylon yarn from the shipping bobbin or

2,603,108

7

pirn; uptwisting the yarn; reeling the yarn into a skein; shrinking the skein yarn while relaxed on a pole or wrapped in a bundle; backwinding the yarn; and finally coning the yarn.

To produce 30 turn 30 denier nylon leg yarn for ladies hosiery in accordance with our method, the twist setting or thermal stabilizing is accomplished simultaneously with uptwisting. In the usual prior art method of processing such yarn, the yarn was first twisted and spooled, and the spool placed for 90 minutes in a chamber wherein the atmosphere was heated to a dry bulb temperature of 170° F. and a wet bulb temperature of 160° F. to set the twist or thermally stabilize the yarn to prevent kinking or snarling in the knitting. Aside from being much more rapid, it will be seen that we have eliminated the double handling required by the prior art methods of preparing nylon leg yarn for ladies hosiery, the improved finished yarn being uniform in its physical characteristics and favoring the production of hosiery of improved attractive appearance, fit and length by reason of the uniformity of its stitches and residual shrinkage.

Another type of new and useful thermoplastic yarn can be produced in accordance with our invention by doubling and twisting two ends at low tension on a double-twister equipped with a heating unit constructed as hereinbefore described with an effective temperature of 400° F. maintained therein, one of the ends having had no previous thermal processing but the other end having previously been redrawn under tension through a similar heating unit installed in a conventional redraw machine also at 400° F. effective temperature. As a result of this processing, the end not previously thermally twisted, shrinks substantially and is wrapped by the other end which did not shrink, the finished yarn thus taking on a desirable cork screw appearance.

To produce a 100 denier 70 turn per inch nylon yarn having a sandy surface and substantially devoid of residual shrinkage, in accordance with our invention, we uptwist the yarn 70 turns per inch at 12,000 R. P. M. utilizing no flier and relying upon the ballooning, which takes place as the yarn is ravelled from the supply, to impart a low tension of approximately 7 grams. It will be seen that the sandy appearance of the yarn results as a consequence of this high twisting of the unheated yarn at the low tension. Yarn so twisted is then run in the apparatus of Fig. 1 with an effective temperature of 400° F. maintained in the restricted heating zone and thereby thermally shrunk, with attendant accentuation of the sandy appearance.

To produce 100 denier 70 turn per inch nylon yarn having a smooth surface and a dull appearance with substantially no residual shrinkage, the procedure followed is the same as in the example immediately above except for the substitution in the apparatus of Fig. 1 of the modified tensioning means 11a shown in Fig. 4. In this modified tensioning means, instead of a grooved wheel, a pair of opposing friction disks 45a are mounted for free rotation upon the laterally bent end of the shank member 46a. The yarn is passed between the disks 45a, one of the latter being yieldingly pressed toward the other by a spring 48b which is finely regulatable by a thumb screw 49a threadedly engaged upon the distal end of the shank member 46a. For the instant purpose, the spring 48a is adjusted to apply a tension of 80 grams upon the yarn as the latter passes between the disks 46a, this degree of tension being greater than the contractile force of the yarn while it is heated to the elevated temperature and is being twisted. This twisting and stretching causes the heated yarn to assume the desired smooth appearance and to have substantially no residual shrinkage.

To produce a 140 denier plied Dacron yarn, having a minimum of residual shrinkage and elongation as well as uniformity of other physical characteristics, in which

8

two ends of 70 denier are each 8 twisted 24 turns per inch and Z twisted together 20 turns per inch, we first up-twist the respective ends in the apparatus of Fig. 1 with maintenance of an effective temperature of 350° F. in the heating device 10 and application of a tension of 70 grams to substantially stretch said ends and thermally stabilize their torsional forces. With this accomplished, we ply the two ends on a down spinner equipped with a similar heating device maintained at an effective temperature of 380° F. under a tension of 100 grams to further stretch and stabilize the torsional forces, and finally up-twist the yarn 20 turns Z in the apparatus of Fig. 1 at a temperature of 400° F. at a tension of 160 grams to still further stretch and thoroughly stabilize the yarn dimensionally and torsionally. While a generally similar yarn could be produced by utilizing certain procedures known in the prior art, a great many more separate steps and intermediate handlings would have to be resorted to, but such yarn would lack uniformity in physical characteristics for the reasons previously pointed out.

To prepare thermoplastic yarns, suitable for tricot knitting, in accordance with our invention, we first wind the yarn from the producer's delivery packages upon cones at an effective elevated temperature and under a tension consistent with optimum shrinkage and tenacity, by running them in a cone winder equipped with a heating device and a regulatable tensioning device like those described in connection with Fig. 1. In this example, only one normal operation is required. If the same requirements were to be met by prior art conventional methods, at least two additional costly operations would be involved namely, winding the yarn into a skein, and shrinking it while in the skein.

To produce uniformly dyed thermoplastic yarn, having maximum tenacity and a minimum of elongation on cones for use in circular knitting machines, the apparatus of Figs. 5 and 6 is utilized on which we cone wind the yarn from the producer's package 201 in one operation by first passing it through a trough 202 containing a dye solution before running it through the yarn tension 203 and the heating device 204 and then winding it onto the constant thread speed cone take-up c, with the effective temperature and the tension so correlated as to obtain maximum stretch without loss of tenacity. In this example, the yarn Y is dried and the dye developed by the action of the effective eleated temperature during traverse of the yarn through the restricted heating zone. Production of such dyed yarns heretofore, required two separate operations to wit: thermal stretching of the yarn, and drying the yarn and developing the dye. Aside from being more costly than yarns produced according to our new method, the processed prior art dyed thermoplastic yarns lacked the desired uniform physical characteristics.

To produce a chemically sized highly twisted uniform nylon yarn with torisonal forces stabilized, in accordance with our new method, we run the yarn from a package 201a of highly twisted nylon yarn in a sizing machine as in Figs. 5 and 6 having a constant thread speed cone take-up c and heating and tensioning means like those in Figs. 5 and 6, utilizing an effective temperature of 250° F. for stabilization, and a tension of 30 grams. The prior art production of yarns of this type entailed a separate stabilizing operation, and the desired uniformity as to characteristics could not be obtained due to irregular shrinking.

To produce a yarn of maximum strength in which an end of thermoplastic yarn is doubled or plied with an end of cotton, in accordance with our invention, we thermally stretch the thermoplastic end to obtain the same elongation at the breaking point as the cotton end runs the two ends together in the apparatus of Fig. 1, the thermal stretching being thus accomplished simultaneously with the plying. Conventionally, several additional

9

operations would be required for attainment of corresponding results.

To produce substantially permanently set highly twisted thermoplastic yarn which is to be untwisted so as to become crimped, waved or fluffed, in accordance with our invention, we run the yarn in a conventional up-twister equipped like the apparatus of Fig. 1 with a tensioning means and a heating device and subject the yarn to a high effective temperature and high tension whereby the thermal setting or stabilizing is accomplished simultaneously with the twisting.

To continuously produce permanently set highly twisted crimped, wavy or fluffed yarn in one continuous operation, according to our invention, we run the yarn in an up-twister equipped like the apparatus of Fig. 1 with a yarn tensioning means and a heating device, but with a special twisting and untwisting spindle such that the yarn is twisted while heated and then cooled, and the untwisting accomplished without interruption in the travel of the yarn. Such processing cannot be done, as far as we are aware, by any prior art method.

To process 70 denier nylon yarn, as received on a pirn from the manufacturer, for attainment of uniformity in appearance, denier size, dyeing properties, elongation, elasticity, residual shrinkage, etc., in accordance with our invention we unwind the yarn from the pirn instead of from a rotated package as in the apparatus in Fig. 1, and run it through the apparatus in the same manner as previously described with maintenance of a uniform effective temperature of 385° F. and a uniform tension between 5 and 140 grams.

It is understood that the heating and tensioning devices herein shown are to be considered as exemplary of others which could be used providing that they are capable of maintaining the uniform temperatures and tensions necessary for attainment of the physical characteristics of our improved thermoplastic yarns.

From the foregoing it will be seen that we have provided a simple method by which various kinds of improved thermoplastic yarns for different purposes can be thermally processed more rapidly and at a much lower cost than heretofore, with assurance of uniformity in appearance and other desired physical characteristics.

The illustrated apparatus, per se, forms the subject matter of a separate patent application, Serial No. 401,952 concurrently filed herewith.

Having thus described our invention we claim:

1. A method of thermally processing thermoplastic yarn which comprises continually drawing the yarn from a source of supply, continually passing the yarn at a selected linear speed under uniform tension through a restricted thermally isolated and uniformly heated zone to uniformly heat the yarn to a prescribed temperature to yarn-set the same, controlling the supply of heat energy to said zone to thereby maintain said heated zone uniformly at the temperature required to uniformly heat said yarn to said prescribed temperature, continually cooling the yarn to stabilize the same after passage under tension through said heated zone, winding the processed yarn, and correlating the tension in said yarn to said prescribed temperature and linear speed of travel of the yarn to maintain the yarn at a uniform tension relative to the contractile force and thermal characteristics of the yarn resulting from heating the same.

2. A method of thermally processing thermoplastic yarn which comprises continually drawing the yarn from a source of supply, continually passing the yarn at a selected linear speed through a restricted thermally isolated and uniformly heated zone to uniformly heat the yarn to a prescribed temperature to yarn-set the same, controlling the supply of heat energy to said zone compensatively according to the ambient temperature and rate of transfer of heat to the yarn to thereby maintain said heated zone uniformly at the temperature required to uniformly heat said yarn to said prescribed temperature, continually

10

cooling the yarn to stabilize the same after passage under tension through said heated zone, winding the processed yarn, maintaining the yarn under a uniform tension during heating, cooling and winding thereof, and correlating the tension in said yarn to said prescribed temperature and linear speed of travel of the yarn to maintain the yarn at a selected uniform tension relative to the contractile force and thermal characteristics of the yarn resulting from heating thereof.

3. A method of thermally processing thermoplastic yarn which comprises continually drawing the yarn from a source of supply, continually passing the yarn at a selected linear speed through a restricted thermally isolated and uniformly heated zone to uniformly heat the yarn to a prescribed temperature to yarn-set the same, controlling the supply of heat energy to said zone compensatively according to the ambient temperature and rate of transfer of heat to the yarn to thereby maintain said heated zone uniformly at the temperature required to uniformly heat said yarn to said prescribed temperature, continually cooling the yarn to stabilize the same after passage under tension through said heated zone, winding the processed yarn, maintaining the yarn under a uniform tension during heating, cooling and winding thereof, and correlating the tension in said yarn to said prescribed temperature and linear speed of travel of the yarn to maintain the yarn at a uniform tension less than the contractile force of the yarn resulting from heating the same to shrink the yarn.

4. A method of thermally processing thermoplastic yarn which comprises continually drawing the yarn from a source of supply, continually passing the yarn at a selected linear speed through a restricted thermally isolated and uniformly heated zone to uniformly heat the yarn to a prescribed temperature to yarn-set the same, controlling the supply of heat energy to said zone compensatively according to the ambient temperature and rate of transfer of heat to the yarn to thereby maintain said heated zone uniformly at the temperature required to uniformly heat said yarn to said prescribed temperature, continually cooling the yarn to stabilize the same after passage under tension through said heated zone, winding the processed yarn, maintaining the yarn under a uniform tension during heating, cooling and winding thereof, and correlating the tension in said yarn to said prescribed temperature and linear speed of travel of the yarn to maintain the yarn at a uniform tension equal to the contractile force of the yarn to stabilize the same.

5. A method of thermally processing thermoplastic yarn which comprises continually drawing the yarn from a source of supply, continually passing the yarn at a selected linear speed through a restricted thermally isolated and uniformly heated zone to uniformly heat the yarn to a prescribed temperature to yarn-set the same, controlling the supply of heat energy to said zone compensatively according to the ambient temperature and rate of transfer of heat to the yarn to thereby maintain said heated zone uniformly at the temperature required to uniformly heat said yarn to said prescribed temperature, continually cooling the yarn to stabilize the same after passage under tension through said heated zone, winding the processed yarn, maintaining the yarn under a uniform tension during heating, cooling and winding thereof, and correlating the tension in said yarn to said prescribed temperature and linear speed of travel of the yarn to maintain the yarn at a uniform tension greater than the contractile force of the yarn to stretch and stabilize the same.

6. A method of thermally processing thermoplastic yarn which comprises continually drawing the yarn from a source of supply, continually twisting the yarn, continually passing the yarn at a selected linear speed under uniform tension through a restricted thermally isolated and uniformly heated zone to uniformly heat the yarn to a prescribed temperature to reorient the molecules

2,808,108

of the yarn to the twisted formation of the yarn and yarn-set the same, controlling the supply of heat energy to said zone compensatively according to the ambient temperature and rate of transfer of heat to the yarn to thereby maintain said heated zone uniformly at the temperature required to uniformly heat said yarn to said prescribed temperature, continually cooling the yarn to stabilize the same after passage under tension through said heated zone, winding the processed yarn, and correlating the tension in said yarn to said prescribed temperature and linear speed of travel of the yarn to maintain the yarn at a uniform tension relative to the contractile force and thermal characteristics of the yarn resulting from heating and twisting the same.

7. A method of thermally processing thermoplastic yarn which comprises continually drawing the yarn from a source of supply, continually twisting the yarn, continually passing the twisted yarn at a selected linear speed through a restricted thermally isolated and uniformly heated zone to uniformly heat the yarn to a prescribed temperature to reorient the molecules of the yarn to the twisted formation of the yarn and yarn-set the same, controlling the supply of heat energy to said zone compensatively according to the ambient temperature and rate of transfer of heat to the yarn to thereby maintain said heated zone uniformly at the temperature required to uniformly heat said yarn to said prescribed temperature, continually cooling the twisted yarn to stabilize the same after passage under tension through said heated zone, winding the processed yarn, maintaining the twisted yarn under a uniform tension during heating, cooling and winding thereof, and correlating the tension in said yarn to said prescribed temperature and linear speed of travel of the yarn to maintain the yarn at a selected uniform tension relative to the contractile force and thermal characteristics of the yarn resulting from heating and twisting the same.

8. A method of thermally processing thermoplastic yarn which comprises continually drawing the yarn from a source of supply, continually twisting the yarn, continually passing the twisted yarn at a selected linear speed through a restricted thermally isolated and uniformly heated zone to uniformly heat the yarn to a prescribed temperature to reorient the molecules of the yarn to the twisted formation of the yarn and yarn-set the same, controlling the supply of heat energy to said zone compensatively according to the ambient temperature and rate of transfer of heat to the yarn to thereby maintain said heated zone uniformly at the temperature required to uniformly heat said yarn to said prescribed temperature, continually cooling the twisted yarn to stabilize the same after passage under tension through said heated zone, winding the processed yarn, maintaining the twisted yarn under a uniform tension during heating, cooling and winding thereof, and correlating the tension in said yarn to said prescribed temperature and linear speed of travel of the yarn to maintain the yarn at a uniform tension less than the contractile force of the yarn resulting from heating and twisting the same to shrink the same.

9. A method of thermally processing thermoplastic yarn which comprises continually drawing the yarn from a source of supply, continually twisting the yarn, continually passing the twisted yarn at a selected linear speed through a restricted thermally isolated and uniformly heated zone to uniformly heat the yarn to a prescribed temperature to reorient the molecules of the yarn to the twisted formation of the yarn and yarn-set the same, controlling the supply of heat energy to said zone compensatively according to the ambient temperature and rate of transfer of heat to the yarn to thereby maintain said heated zone uniformly at the temperature required

to uniformly heat said yarn to said prescribed temperature, continually cooling the twisted yarn to stabilize the same after passage under tension through said heated zone, winding the processed yarn, maintaining the twisted yarn under a uniform tension during heating, cooling and winding thereof, and correlating the tension in said yarn to said prescribed temperature and linear speed of travel of the yarn to maintain the twisted yarn at a uniform tension equal to the contractile force of the yarn to stabilize the same.

10. A method of thermally processing thermoplastic yarn which comprises continually drawing the yarn from a source of supply, continually twisting the yarn, continually passing the twisted yarn at a selected linear speed through a restricted thermally isolated and uniformly heated zone to uniformly heat the yarn to a prescribed temperature to reorient the molecules of the yarn to the twisted formation of the yarn and yarn-set the same, controlling the supply of heat energy to said zone compensatively according to the ambient temperature and rate of transfer of heat to the yarn to thereby maintain said heated zone uniformly at the temperature required to uniformly heat said yarn to said prescribed temperature, continually cooling the twisted yarn to stabilize the same after passage under tension through said heated zone, winding the processed yarn, maintaining the twisted yarn under a uniform tension during heating, cooling and winding thereof, and correlating the tension in said yarn to said prescribed temperature and liner speed of travel of the yarn to maintain the twisted yarn at a uniform tension greater than the contractile force of the yarn to stretch and stabilize the same.

11. A method of thermally processing and dyeing thermoplastic yarn which comprises continually drawing the yarn from a source of supply, continually applying a dye to the yarn travelling at a selected linear speed, continually passing the yarn at a selected linear speed under uniform tension through a thermally isolated and uniformly heated zone to uniformly heat the yarn to a prescribed temperature to dry and uniformly develope the dye-stuff and yarn-set the yarn, controlling the supply of heat energy to said zone compensatively according to the ambient temperature and rate of transfer of heat to the yarn to thereby maintain said heated zone uniformly at the temperature required to uniformly heat said yarn to said prescribed temperature, continually cooling the yarn to stabilize the same after passage under tension through said heated zone, winding the processed yarn, and correlating the tension in said yarn to said prescribed temperature and linear speed of travel of the yarn to maintain the yarn at a uniform tension relative to the contractile force and thermal characteristics of the yarn resulting from heating the same and relative to the chemical-physical properties of the dyestuff.

References Cited in the file of this patent

UNITED STATES PATENTS

| 1,330,534 | Hertel | Feb. 10, 1920 |
|---|---|---|
| 1,987,449 | Schweizer et al. | Jan. 8, 1935 |
| 2,089,229 | Taylor | Aug. 10, 1937 |
| 2,111,211 | Finlayson | Mar. 15, 1938 |
| 2,169,270 | McNally | Aug. 15, 1939 |
| 2,343,892 | Dodge | Mar. 14, 1944 |
| 2,411,132 | Hathorne et al. | Nov. 12, 1946 |
| 2,509,741 | Miles | May 30, 1950 |
| 2,617,007 | Atkins | Nov. 4, 1952 |
| 2,711,627 | Leath | June 28, 1955 |

FOREIGN PATENTS

| 135,137 | Australia | Mar. 18, 1947 |
|---|---|---|

**100**

## APPENDIX B

THIS AGREEMENT made this 15th day of December, 1952, by and between WARREN A. SEEM, of Gwynodd, Pennsylvania, NICKOLAS J. STOD-DARD, FRED TECCE and HAROLD P. BERGER, all of Philadelphia, Pennsylvania, (hereinafter called "Licensors"), parties of the first part, and SYN-FOAM YARNS INC., a corporation organized and existing under the laws of the State of Delaware, (hereinafter called "Licensee"), party of the second part.

## WITNESSETH:

1. (a) The Licensors represent that they have developed and are the sole owners (free from all encumbrances) of novel methods and means of processing nylon and other thermo-plastic yarns in such a manner as to impart a substantially permanent crimp or fluff thereto, which methods and means (including the improved spindle) are hereinafter referred to as the invention, and that the invention includes a spindle, an electric heating unit, a yarn tension device and auxiliary equipment required to convert conventional up-twisting machines to enable them to produce crepe or crimped or fluffed thermal-set yarns, which spindle, unit, device and equipment are herein collectively hereafter referred to as the improved spindle except as otherwise noted.

(b) The hereinabove methods and means were recently disclosed on May 20, 1952, in whole or in part, to Messrs C. R. Steedman, T. Leo Power, Wm. J. Hoag and Wm. A. Griffin, all representing the Licensee and a copy of the secret disclosure signed by all of them is attached hereto and becomes part of this agreement.

(c) References to the invention include both the invention as above set forth and all improvements therein made or acquired by the Licensors and also the improved spindle as above defined, and all improvements therein made or acquired by the Licensors, all insofar as such improvements in the invention or in the improved spindle apply to the invention or the improved spindle referred to in paragraph 1(a) or paragraph 1(b) above or to the utilization of the improved spindle in the production of thermoplastic crepe yarns by adding twist to a previously highly twisted yarn, thermosetting and removing the same amount of twist as added; but such references do not include either (i) the inventions covered by U.S. Patents Nos. 2,353,666 and 2,411,132, both of which are owned by Crepe de Chine, Inc., a Pennsylvania corporation, or (ii) the use of the methods and means aforesaid for thermal shrinking, thermal stretching or thermal stabilizing of thermoplastic yarns other than incidentally to the production of crepe yarns as aforementioned or incidentally to imparting thereto a crimp or fluff as aforesaid. The Licensee agrees to refrain from any use, other than herein specifically licensed.

(d) To properly effect the intent hereof the Licensors agree that any improvements that they have made or may make in the future in the invention or in the improved spindle, all insofar as such improvements apply to the invention or the improved spindle referred to in paragraph 1(a) or paragraph 1(b) above or to the utilization of the improved spindle in the production of crepe yarns as aforesaid will be divulged to and made available, free of charge, to the Licensee.

2. The Licensors within three months from the date hereof will apply for a United States patent or patents in respect of the invention, and will prosecute such application or applications with all possible diligence. The Licensors agree that they will be sole owners free of encumbrances of the exclusive right to make, use and sell under (which right they will not exercise) and the exclusive license to grant to others the right to make, use and sell under said

applications and under all patents which may issue therefrom so far as they pertain to methods and means of producing crepe, crimped or fluffed thermalset yarns by twisting and untwisting. When serial numbers have been designated by the U.S. Patent Office to such patent applications the Licensors will promptly advise the Licensee of the serial numbers so designated.

3. The Licensors hereby license and authorize the Licensee, within the United States and its possessions, to the extent limited above, i. e., for the production of crepe, crimped or fluffed thermalset yarns, to use the invention at all times during the term of this agreement (including the right to make or have made for its own use as provided herein improved spindles and all parts thereof, the right to operate them and the right to make, use and sell any product processed thereon whether or not patent protection is obtained in respect of such product) and on the request of the Licensee will confirm this license and authorization after the issue of any patent or patents on the invention or any improvements as a license and authorization under such patent or patents. Without limitation of the foregoing Licensors agree at the request of the Licensee at any time and from time to time (a) to use their best efforts to procure for the Licensee as promptly as feasible such number of the improved spindles or parts therefor as the Licensee shall from time to time order, all at cost to the Licensors and without any profit to the Licensors or any charge for their services, the cost to the Licensee per improved spindle or part to be as low as the cost to anyone else with whom the Licensors deal at the time, and (b) at their own cost and expense to furnish the Licensee as and when requested by it with information, advice and assistance for the proper installation, maintenance, operation and use of the improved spindles and for the practice of the invention.

4. The Licensee hereby authorizes the Licensors to procure for the Licensee 1,000 of the improved spindles for installation on frames now owned by D. W. Rich & Company, Incorporated, a New York corporation, hereinafter called "Rich". The Licensors will order such improved spindles for the Licensee for delivery as soon as practicable and as soon as any other improved spindles are delivered to anyone. The Licensors estimate but cannot guarantee that the cost of such improved spindles installed will not exceed $20 a spindle inclusive of the heating unit and all parts. The Licensors will not actually place any order without the approval of such order by the Licensee, but such approval shall not be unreasonably withheld. The Licensee will use its best efforts to complete the installation of such improved spindles as soon as reasonably practicable without undue expense.

5. The Licensors will at all times at the request of the Licensee, without charge and to the best of their ability, assist it in any marketing problems by giving it all data available to the Licensors in respect of the suitability of yarn processed on the improved spindles for various purposes and full details of the best methods of weaving, knitting and using the same for such purposes, and otherwise.

6. The Licensors will likewise use their best efforts to assist the Licensee to obtain a position with DuPont for a supply of nylon to the Licensee, but will not commit the Licensee in any way.